No. 23-30908
# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

INCLUSIVE LOUISIANA; MOUNT TRIUMPH BAPTIST CHURCH; RISE ST. JAMES, by and through their members,

*Plaintiffs - Appellants,*

v.

ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION,

*Defendants - Appellees.*

---

On appeal from United States District Court for the Eastern District of Louisiana, Case No. 2:23-cv-00987

---

## APPELLANTS' REPLY BRIEF

---

Astha Sharma Pokharel
Baher Azmy
Sadaf Doost
Pamela Spees
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

William P. Quigley
Loyola University College of Law
7214 St. Charles Ave.
New Orleans, LA 70118

*Counsel for Appellants Inclusive Louisiana and Mount Triumph Baptist Church*

Clara Potter
Devin A. Lowell
Tulane Environmental Law Clinic
6329 Freret Street
New Orleans, LA 70118

*Counsel for Appellant RISE St. James*

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................................i
TABLE OF AUTHORITIES ............................................................... iii
INTRODUCTION ................................................................................1
ARGUMENT .......................................................................................3
I.   CLAIMS I-IV AND CLAIM VI ARE NOT TIME-BARRED.........................3
     A. Claims I-IV Are Timely Challenges to a Continuing Pattern, Practice, and Policy....................................................................................3

          1. Claims I-IV Are Based on Continuing Violations by the Parish, and Are Not Just the Continuing Effects of the Plan. .......................................4

          2. Plaintiffs' Claims Are Precisely the Types of Pattern-and-Practice Claims Where the Continuing Violations Doctrine Should Apply............7

          3. The Parish's Other Attempts to Avoid Accountability Are Unavailing. ...............................................................................................12

     B. Claim VI Is a Timely Challenge to the Imposition of a Land Use Regulation..................................................................................14

II.  PLAINTIFFS SUFFICIENTLY PLEAD STANDING. ...................................14
     A. Plaintiffs' Religious Injuries Are Traceable to the Parish. .........................16

          1. The Parish Seeks to Impose an Unsupported Heightened Traceability Standard. ............................................................................16

          2. Plaintiffs Have Shown Religious Injury-In-Fact; to the Extent the Parish Raises 12(b)(6) Arguments Regarding Claim V, They Are Unavailing. ...............................................................................................18

     B. Plaintiffs' Injuries Are Actionable Under Article XII, Section 4, of the Louisiana Constitution. ...........................................................20

     C. Contrary to the Parish's Feigned Ignorance, the Complaint Demonstrates Causation for the Property Injuries Suffered by All Three Plaintiffs and Their Members. .........................................................................21

     D. The Parish Has Personally Denied Plaintiffs Equal Treatment in a Manner that is Concrete, Particularized, and Actual, Giving Rise to Stigmatic Harm. .........................................................................23

III. Issues Not Addressed by the District Court. ...................................................26

A. Claim I, Thirteenth Amendment: Plaintiffs Sufficiently Plead Facts Demonstrating That the Land Use System in St. James Parish is a Badge or Incident of Slavery in Violation of the Thirteenth Amendment. .................28

B. Claim II, Equal Protection: Plaintiffs Sufficiently Plead Facts Demonstrating Racially Discriminatory Impact / Unequal Treatment *and* Racially Discriminatory Intent. ....................................................................29

    1.Unequal Treatment / Racial Discrimination..........................................29

    2. Plaintiffs Sufficiently Plead Discriminatory Intent or Purpose, Addressing *All* of the Non-Exhaustive *Arlington Heights* Factors. .........33

C. Claim III, Substantive Due Process: Strict Scrutiny, Not Rational Basis, Applies to Reviews of Bodily Integrity Claims, Which Plaintiffs Have Sufficiently Pled. .............................................................................................35

D. Claim IV, 42 U.S.C. § 1982: Plaintiffs Sufficiently Pled Intentional Discrimination in the Violation of their Property Rights..............................37

E. Claim VI, RLUIPA Nondiscrimination: Mount Triumph Has Sufficiently Pled an RLUIPA Discrimination Claim........................................................37

CONCLUSION .......................................................................................................38

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................ 20
*Bennett v. Spear*,
  520 U.S. 154 (1997) ........................................................................ 16
*Brennan v. Stewart*,
  834 F.2d 1248 (5th Cir. 1988) ....................................................... 35
*Boswell v. Claiborne Par. Det. Ctr.*
  629 F. App'x 580 (5th Cir. Oct. 21, 2015) ................................... 8, 9
*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
  807 F.3d 1031 (9th Cir. 2015) ................................................... 17, 18
*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) ................................................................... 32, 35
*Civil Rights Cases*,
  109 U.S. 3 (1883) ............................................................................ 28
*Columbus Bd. of Educ. v. Penick*,
  443 U.S. 449 (1979) ........................................................................ 34
*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) .......................................................................... 5
*Duvall v. Dallas Cnty.*,
  631 F.3d 203 (5th Cir. 2011) ........................................................... 8
*Farmer v. Brennan*,
  511 U.S. 825 (1970) ........................................................................ 37
*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................... 18, 20
*Groden v. City of Dallas*,
  826 F.3d 280 (5th Cir. 2016) ........................................................... 6
*Guertin v. Michigan*,
  912 F.3d 907 (6th Cir. 2019) ..................................................... 35, 36
*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) .......................................................................... 7
*Hearn v. McCraw*,
  856 F. App'x 493 (5th Cir. 2021) ................................................. 10
*Heckler v. Mathews*,
  465 U.S. 728 (1984) ................................................................... 25, 26

*Hitt v. McLane*,
   854 Fed. App'x. 591 (5th Cir. 2021) ................................................... 36

*Humphreys v. Bennett Oil Corp.*,
   195 La. 531 (La. 1940) ...................................................................... 19

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) .......................................................................... 33

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) .............................................................. 4

*In re Highland Cap. Mgmt., L.P.*,
   74 F.4th 361 (5th Cir. 2023) ............................................................. 38

*Johnson v. Rodriguez*,
   110 F.3d 299 (5th Cir. 1997) ............................................................ 30

*Jones v. Lumpkin*,
   No. 21-20106, 2023 WL 3075063 (5th Cir. Apr. 25, 2023) ......... 11, 12

*Kokesh v. Curlee*,
   14 F.4th 382 (5th Cir. 2021) ............................................................... 4

*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*,
   422 F.3d 490 (7th Cir. 2005) ............................................................ 16

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992) ........................................................................ 22

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .......................................................................... 24

*Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*,
   827 F.3d 452 (5th Cir. 2016) ............................................................ 22

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978) ........................................................................ 7, 9

*Moore v. Bryant*,
   853 F.3d 245 (5th Cir. 2017) ............................................................ 24

*N. Carolina State Conference of NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ............................................................ 34

*Nat'l R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002) ............................................................................ 9

*Nicholson v. W.L. York, Inc.*,
   No. 23-20440, 2024 WL 913378 (5th Cir. Mar. 4, 2024) ............... 7, 8

*Petroplex Int'l v. St. James Parish*,
   158 F. Supp. 3d 537 (E.D. La. 2016) ................................................ 35

*Perez v. Laredo Junior Coll.*,
   706 F.2d 731 (5th Cir. 1983) .............................................................. 8

*Pit River Tribe v. U.S. Forest Serv.*,
   469 F.3d 768 (9th Cir. 2006) ............................................................ 18

*Pye v. United States*,
   269 F.3d 459 (4th Cir. 2001)..................................................................... 17

*Resnick v. AvMed, Inc.*,
   693 F. 3d 1317 (11th Cir. 2012)............................................................... 23

*Reyes v. N. Texas Tollway Auth*,
   861 F.3d 558 (5th Cir. 2017) .................................................................... 35

*Riggins v. Nevada*,
   504 U.S. 127 (1992) ................................................................................. 35

*Romero v. United States*,
   784 F.2d 1322 (5th Cir. 1986)........................................................... 19, 26

*Rushing v. Yazoo Cnty.*,
   861 F. App'x 544 (5th Cir. 2021) ........................................................... 11

*Stewart v. Mississippi Transport Commission*,
   586 F.3d 321 (5th Cir. 2009)................................................................... 12

*Stukenberg ex rel. M.D.*,
   907 F.3d 237 (5th Cir. 2018)............................................................. 36, 37

*Sylvia Dev. Corp. v. Calvert Cnty.*,
   48 F.3d 810 (4th Cir. 1995) ..................................................................... 34

*Thomas v. Mobley*,
   118 So. 2d 476 (La. App. 1 Cir. 1960)..................................................... 20

*Tyson v. Sabine*,
   42 F.4th 508 (5th Cir. 2022) .................................................................... 35

*United States v. Brown*,
   561 F.3d 420 (5th Cir. 2009)................................................................... 33

*United States v. City of Parma, Ohio*,
   661 F.2d 562 (6th Cir. 1981)................................................................. 5, 7

*United States v. Herrera-Ochoa*,
   245 F.3d 495 (5th Cir. 2001)................................................................... 14

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016).............................................................. 33, 34

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................ 9, 30, 33

*Village of Euclid v. Ambler Realty Co.*,
   272 U.S. 365 (1926) ................................................................................. 22

*Waterford Citizens' Ass'n v. Reilly*,
   970 F.2d 1287 (4th Cir. 1992)................................................................. 18

*Webster v. City of Houston*,
   735 F.2d 838 (5th Cir. 1984).................................................................. 8, 9

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   586 U.S. 9 (2018) .................................................................................... 22

*Wheelahan v. City of New Orleans*,
    No. 19-11720, 2020 WL 1503560 (E.D. La. Mar. 30, 2020) ........................ 31, 32
*Williams ex rel. J.W. v. City of Jackson*,
    663 F.Supp.3d 624, 640 (S.D. Miss. 2023)......................................................... 36

## Statutes

42 U.S.C. 1982 ................................................................................................. 37
42 U.S.C. § 1983 ........................................................................................ Passim
42 U.S.C. § 2000cc–5(5) .................................................................................. 19
42 U.S.C. § 2000cc(b)(2) ............................................................................ 14, 37

## Constitutions

U.S. Const. Amend. XIII ............................................................................ Passim
U.S. Const. Amend. XIV, §1 ...................................................................... Passim
La. Const. Art. XII, Sec. 4 .............................................................................. 20

## Rules

Fed. R. Civ. Proc. 12(b)(6) ........................................................................ Passim

## Other Authorities

La. Atty. Gen. Op. No. 08-0186 ....................................................................... 19

# INTRODUCTION

In its opposition brief, Defendant-Appellant St. James Parish (the "Parish") continues to mischaracterize the continuing nature of the violations that Plaintiffs-Appellants' claims are based upon, feigns ignorance about its primary role in directing the location of industrial facilities in the Parish, and ultimately seeks to absolve itself of responsibility for its ongoing pattern, practice, and policy of land use discrimination that began decades ago, is rooted in slavery and its afterlife, and continues through to today.

First, notwithstanding black letter law that, at the motion to dismiss stage, a court must view the complaint in the light most favorable to Plaintiffs, the Parish repeats the district court's error and continues to misconstrue Claims I-IV (relating to 42 U.S.C. § 1983 and § 1982 violations) as a discrete-act challenge to only the 2014 Land Use Plan ("Plan"). But Plaintiffs' Complaint extensively alleges that they are not challenging the Plan, or its subsequently amended versions, by itself. Rather, the allegations show that Plaintiffs' challenge is to a broader discriminatory pattern and practice of land use decision-making that has continued into the relevant § 1983 and § 1982 limitations period, of which the Plan is just one component. Indeed, invalidation of the Plan, without more, would not remedy the harm to Plaintiffs alleged under those claims. Additionally, the Parish continues to disregard the true nature of Claim VI, misrepresenting it as an untimely challenge

to the validity of the Plan itself, when that claim is actually a challenge to the subsequent *imposition* of the Plan within the Religious Land Use and Institutionalized Persons Act ("RLUIPA") limitations period.

Second, the Parish continues to feign ignorance about the primacy of its role in furthering this discriminatory pattern, practice, and policy, insisting that the accumulation of harmful industrial facilities in the majority-Black Fourth and Fifth districts is the result of actions by private third parties, and cannot be attributed to the Parish. But the Parish is the primary regulator of land use: industrial facilities cannot unilaterally choose to locate anywhere in the Parish without Parish approval, and the Complaint shows that the Parish has exercised its approval authority to steer industry to majority-Black districts. Thus, the Court cannot countenance the Parish's attempt to absolve itself of the harms it directly causes— the stigma of unequal treatment, exposure to serious environmental risks to health and life, or the harm to property and to sites of cultural, historic, religious, or aesthetic significance.

Finally, the Parish raises a number of Rule 12(b)(6) arguments not addressed by the district court, which rely on mischaracterizations or disregard the extensive allegations in the Complaint. In any case, this Court should follow its practice and allow the district court to resolve those additional, detail-oriented 12(b)(6) issues in the first instance.

# ARGUMENT

## I. CLAIMS I-IV AND CLAIM VI ARE NOT TIME-BARRED.

Repeating the district court's error, the Parish continues to mischaracterize Claims I-IV and VI to argue that they are time-barred.[1]

### A. Claims I-IV Are Timely Challenges to a Continuing Pattern, Practice, and Policy.

Claims I-IV—claims brought under § 1983 and § 1982—timely challenge the Parish's ongoing pattern and practice of steering harmful industry into majority-Black districts. Yet the district court misconstrued, and the Parish continues to mischaracterize, these claims as discrete-act challenges to the Parish's 2014 Land Use Plan, and therefore untimely. The Complaint is clear: these Claims are not challenging the Plan or any individual land use decision by itself. The Plan is simply evidence of an unlawful pattern and practice—a continuing violation forming the basis of these Claims—which began long before the Plan's enactment, continued after it into the limitations period, and indeed *still* exists and *would* exist even without the Plan.

---

[1]     The district court did not dismiss these claims for lack of standing, nor could it have, as it found that Plaintiffs had standing based on "continuing harm and threatened future harm." ROA.1013.

1. <u>Claims I-IV Are Based on Continuing Violations by the Parish, and Are Not Just the Continuing Effects of the Plan.</u>

First, Plaintiffs' claims are not a discrete-act challenge to the Plan since the discriminatory pattern and practice extends beyond that allowed by the Plan. This is best evidenced by the fact that the pattern and practice has continued into the limitations period through at least four land use decisions, each *contrary to or independent of* the Plan. Neither of the two decisions on August 17, 2022 (Doc. 47, Pls.' Br. 40-41 ("Pl.'s Br.")) were made under or contemplated by the Plan. And the two decisions on July 31 and October 11, 2023 (Pls.' Br. 41) were made *contrary* to it: that is, the Parish twice approved industrial uses in predominantly-Black areas that even the Plan had designated for residential use or as wetlands, perpetuating the ongoing pattern of Parish discrimination stated in Claims I-IV. Pls.' Br. 41-42.[2] These decisions cannot be considered "continuing effects" of the Plan because they (like several others before them, Pls.' Br. 41-42) are contrary to it. In other words, even if a court were to invalidate the Plan, without more, Plaintiffs' claims would not be resolved as the Parish would continue its discriminatory pattern and practice.

The Parish argues that the Court should not consider the two decisions by the Parish on August 17, 2022 as part of this discriminatory pattern and practice

---

[2]     The Parish argues that this Court should disregard actions taken by the Parish after Plaintiffs filed their Complaint, but the case cited by the Parish does not address judicially

because the solar moratorium was Parish-wide, not district-specific. Doc. 70, Def.'s Br. 49 ("Def.'s Br."). But Plaintiffs amply allege that this decision was discriminatory because it was requested by and intended to protect white residents, in particular a majority-white District, from a proposed solar farm, while Black residents' repeated requests for similar protection from harmful industry have been denied. ROA.684-686.[3]

Second, contrary to the Parish's claim that "prior to 2014, there are no allegations of any actions taken by St. James Parish," (Def.'s Br. 38), Plaintiffs allege several pre-2014 discriminatory acts. *See, e.g.*, ROA.657, 660-661 [¶¶221, 231-35] (Parish President "actively assist[ed]" Shintech to locate in Convent in 1990s); ROA.663 [¶¶248-249] (in 2011, "Parish officials found another company willing to take the place Shintech had given up on"—Nucor Steel); ROA.719 [¶499] (in 1966, "the Parish allowed the construction of the Gulf Oil Corporation's Faustina Works fertilizer plant"). Even the Parish seems to recognize that these

---

noticeable facts. Defs.' Br. at 29, n.6 (citing *In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014)). The Fifth Circuit has been abundantly clear that "an appellate court may judicially notice certain facts, even if the district court did not." *Kokesh v. Curlee*, 14 F.4th 382, 385 n.3 (5th Cir. 2021).

[3] The Parish also argues (citing nothing) that inaction—in this case the refusal to impose a moratorium to protect residents of majority-Black districts from harmful industry—cannot be an act of discrimination. Def.'s Br. 29. But it is clearly established that inaction, particularly when it is selective, can give rise to a claim of discrimination. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989) (government "may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause"); *United States v. City of Parma, Ohio*, 661 F.2d 562, 574 (6th Cir. 1981) (district court did not err in concluding that City's failure to adopt a resolution welcoming persons of goodwill "constituted part of a pattern or practice of" unlawful official conduct).

pre-2014 acts are alleged to be on a continuum with the Plan when it characterizes those discriminatory acts as "coalescing" in the Plan (Def.'s Br. 18). But it summarily insists that courts should refrain from examining this continuous discriminatory pattern and practice beyond 2014 because it was codified in the Plan. As argued by Plaintiffs (Pls.' Br. 29), this is an untenable position: it would mean that the government could continue violating the constitution for years as a matter of pattern or practice, but be immunized from any liability as soon as it enacted a law that "coalesced" this unlawful practice, even if the practice continued into the limitations period.

In later proceedings, the Parish would be free to argue that the acts of discrimination alleged under Claims I-IV do not amount to a pattern and practice of discrimination (Def's. Br. 44), but at the 12(b)(6) motion to dismiss stage, the Court must accept the facts pled by Plaintiffs as true and must view the Complaint in the light most favorable to Plaintiffs. *See Groden v. City of Dallas*, 826 F.3d 280, 282 (5th Cir. 2016) (for municipal § 1983 liability, district court had wrongly interpreted plaintiff's claim as challenging an ordinance, when plaintiff had actually pled challenge to city's alleged practice of "arresting vendors . . . despite knowing that no law provided probable cause for the arrests").

2.  Plaintiffs' Claims Are Precisely the Types of Pattern-and-Practice
    Claims Where the Continuing Violations Doctrine Should Apply.

The Parish misleadingly argues that the continuing violations doctrine only

applies to hostile work environment claims, Def.'s. Br. 43 (citing *Nicholson v.*

*W.L. York, Inc.*, No. 23-20440, 2024 WL 913378, at *4 (5th Cir. Mar. 4, 2024)),

and, without explanation, that Plaintiffs do not allege a pattern and practice. The

assertion is equal parts confusing and remarkable given that a "policy, practice,

and/or custom" is precisely what Plaintiffs plead. ROA.731-741 [¶¶554, 564, 572,

579, 607].

First, the Parish fails to explain why Claims I-IV are not comparable to the

cases that Plaintiffs describe in pages 34-39 of their opening brief, including

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). The Parish does gesture

toward distinguishing *City of Parma*, 661 F.2d 562, by describing that case as

turning on the fact that only the Attorney General was permitted by the Fair

Housing Act to bring pattern-and-practice claims, arguing that nothing in that case

creates a "pattern and practice exception to claims before this court." Def.'s. Br.

42. Yet, aside from the fact that the Supreme Court rejected over forty years ago

the argument that Fair Housing Act pattern-and-practice claims can only be

brought by the Attorney General, *Havens Realty Corp.*, 455 U.S. at 381, n.23, it is

foundational that an *individual* can bring § 1983 claims challenging a pattern,

practice, policy, or custom of a local government authority. *Monell v. Dep't of Soc.*

*Servs. of City of New York*, 436 U.S. 658, 690–91 (1978); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984), *aff'd en banc and rev'd on other grounds,* 739 F.2d 993 (5th Cir. 1984); *Duvall v. Dallas Cnty.*, 631 F.3d 203, 208 (5th Cir. 2011).[4]

Second, contrary to the Parish's characterization of *Nicholson* (Def's. Br. 43), this Court did not hold that the doctrine only applies to hostile work environment claims; that would be contrary to clear precedent. Pls.' Br. at 34-39 (describing Supreme Court, Fifth Circuit, and other precedent applying the doctrine to Fair Housing Act, § 1983, and other claims). Rather, the plaintiff in *Nicholson* had *conceded* that she was challenging a "discrete discriminatory act," 2024 WL 913378, at *3; this Court was simply stating that while the doctrine applies to hostile work environment claims, it does not apply to discrete-act claims.

Third, Claims I-IV allege precisely the type of pattern and practice where the continuing violations doctrine must apply. Like in the hostile work environment context, Plaintiffs' claims did not arise out of any individual land use decision, but

---

[4]     The Parish also attempts to distinguish *Boswell v. Claiborne Par. Det. Ctr.* by inexplicably stating that "[n]othing in [*Boswell*] stands for the proposition that the continuing violation theory is available to any § 1983 claims pled," Def.'s Br. 51, but this Court in *Boswell* vacated the district court's dismissal of one of plaintiffs' § 1983 claims as untimely because "he has pleaded a continuing violation." 629 F. App'x 580, 583 (5th Cir. Oct. 21, 2015). Similarly, the Parish makes much of the fact that in *Perez v. Laredo Junior Coll.*, plaintiff was alleging "not just a pattern or practice, but the exact same act and harm occurring twice a month, every month"—but whether the acts at issue were the exact same was not relevant to this Court's ruling that the continuing violations doctrine could apply to plaintiffs' equal protection claim. 706 F.2d 731, 735 (5th Cir. 1983).

out of the decades-long accumulation of dozens of facilities (and the Parish's continued steering of facilities) into their communities. Like in the employment context, an individual land use decision (comparable to a single act of harassment) may or may not be actionable on its own, but this pattern and practice of discriminatory steering (comparable to a hostile work environment) can only have "occur[red] over a series of . . . years," because it required many land use decisions over time. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).

The Parish contends that the doctrine should not apply because none of Plaintiffs' claims "*require* proof of repeated conduct nor the creation of a particular *environment*." Def's. Br. 44. However, Plaintiffs' claim is precisely that the Parish's discriminatory pattern and practice has created a harmful environment. *See, e.g.*, ROA.732-736 [¶¶556, 565, 575] (Thirteenth Amendment, Equal Protection, and Bodily Integrity violations increased cancer risk in Fourth and Fifth districts because of increased cumulative pollution). Additionally, Claims I-IV *do* require showing of an official custom or policy, *Monell*, 436 U.S. at 690–91, which can be shown through a "persistent, widespread practice." *Webster,* 735 F.2d at 841. Moreover, some of Plaintiffs' claims require a showing of historical conduct (Pls.' Br. 44 citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267-68 (1977) and *Boswell*, 629 F. App'x at 583), and the doctrine recognizes

that it would be unjust to require a Plaintiff to wait to compile this history of repeated conduct or notice to then dismiss the claim as untimely.

This is also why a notice limitation on a pattern-or-practice claim such as Plaintiffs' is untenable, as the cumulative effects of the discriminatory land use decisions did not arise at any one moment in time, and so Plaintiffs cannot have known precisely when the unlawful pattern and practice alleged in Claims I-IV accrued. The Parish's insistence that such a notice limitation should apply (Def.'s. Br. 36-38) is contrary to precedent established by the Supreme Court and by this Circuit (Pls.' Br. 45-47).

Finally, in obvious contrast to Plaintiffs' case, the cases the Parish relies upon in its brief simply challenge violations that occurred as soon as a particular regulation or law was enacted, not violations based on cumulative acts or a pattern or practice. In *Hearn v. McCraw*, plaintiffs claimed that a 1997 amendment to a law requiring people convicted of sex offenses to register with the state for life, breached an agreement plaintiffs entered into with the state in the 1990s related to a guilty plea. 856 F. App'x 493, 495 (5th Cir. 2021). It was this breach, which occurred in 1997 when the law passed, which they contended violated their substantive due process rights in violation of § 1983. *Id*. The continuing violations doctrine did not apply because plaintiffs did not allege a pattern or practice of violations, or any other action by defendants following 1997. *Id*. at 496.

Similarly, in *Rushing*, the plaintiff brought § 1983 challenges to county policies adopted in 1997 and 2008 that disqualified employees in his public defenders' office from certain employment benefits. *Rushing v. Yazoo Cnty.*, 861 F. App'x 544, 548 (5th Cir. 2021). He was hired as a public defender for the second time in 2009 and filed the lawsuit in 2018. *Id* at 549-50. This Court ruled that the continuing violations doctrine did not apply although the plaintiff was issued paychecks within the limitations period that did not include benefits deductions, because he was simply challenging the 1997 and 2008 policies. *Id*. at 553. The plaintiff alleged no pattern or practice, or new acts by defendant.

Nor is *Jones v. Lumpkin* comparable. Def.'s Br. 40. There, an incarcerated plaintiff brought RLUIPA and § 1983 challenges to a 2009 policy that prohibited external purchases of scented prayer oils. No. 21-20106, 2023 WL 3075063, at *2 (5th Cir. Apr. 25, 2023). He was incarcerated in 2012 and brought the claims in 2018, arguing that although he needed the oils daily for his religious practice, he discovered the existence of the policy in 2017 when he finally had funds to purchase the oils. *Id*. at *1-2. But at summary judgment this Court affirmed that "[n]othing in the record supports Jones's assertion that he did not have the funds to purchase scented prayer oil until May 2017." *Id*. Because of this, the Court found this was a discrete-act claim challenging a policy that harmed him the moment he was incarcerated in 2012. *Id* at *4. Unlike in *Jones*, the Parish here has not

disputed the facts that form the basis of Plaintiffs' pattern-and-practice continuing violations claims, nor could it at the motion to dismiss stage.

### 3. The Parish's Other Attempts to Avoid Accountability Are Unavailing.

First, the Parish argues, citing to *Stewart v. Mississippi Transport Commission*, 586 F.3d 321 (5th Cir. 2009), that the 2014 Plan, and the 2018 amendments, are "intervening acts" that sever any ties between pre- and post-2014 discriminatory actions. Def.'s Br. 45. This is inaccurate. *Stewart* requires the intervening act that severs time periods for limitations purposes to be intentionally remedial. *Stewart,* 586 F.3d at 329 ("Prompt remedial action must be reasonably calculated to end the harassment") (internal quotations omitted). The Plan, even as amended in 2018, did not remedy the pattern and practice of discrimination, but in fact is further evidence of it, as it continues to steer harmful industry into majority-Black districts, and fails to protect Black schools, cemeteries, and churches. ROA.670-677 [¶¶277-299] (2014 Plan is evidence of discriminatory land use pattern and practice), [¶¶300-304] (2018 amendments to Plan do not remedy intentional discrimination, and actually expand area designated for industrial development in the Fifth District).

Second, the Parish insists, citing no authority, that it "and the elected officials directing its affairs, have changed over the years." Def.'s Br. 41. But a change in elected officials does not absolve a government body of accountability

for an unlawful pattern and practice it has continued. Were it otherwise, a plaintiff would be without recourse for continuing constitutional violations any time a new set of officials was elected into office.

Third, revealing a serious misunderstanding or otherwise an intentional mischaracterization of Plaintiffs' claims, the Parish argues that if the Court were to accept that Plaintiffs' claims are based on a continuing violation, individual land use decisions by the Parish could be challenged indefinitely. Def.'s Br. 46. But as Plaintiffs have repeatedly explained, they do not challenge any discrete act and as such they do not seek to invalidate any individual land use approval under Claims I-IV. Instead, they seek declaratory and prospective relief: an end to the discriminatory pattern and practice.[5] ROA.742-743 (seeking a judgment: "declaring that Defendants' policies, practices, and/or customs pertaining to the discriminatory land use system . . ." are unlawful; "[e]njoining Defendants from siting more industrial facilities . . . in the 4th and 5th Districts . . ."; "[e]njoining Defendants from continuing all policies, pattern and practices, and/or customs pertaining to the racially and religiously discriminatory land use system.").

---

[5]     Plaintiffs do challenge individual land use decisions related to Formosa and South Louisiana Methanol under Claim V – RLUIPA (Substantial Burden), ROA.738-39 [¶¶587(b), (c)]; ROA.743 [¶(B)], but these violations were discovered by Plaintiffs within the 4-year RLUIPA limitations period, and Plaintiffs' Claim V is timely. Pls.' Br. at 50, n.10.

### B. Claim VI Is a Timely Challenge to the Imposition of a Land Use Regulation.

Under RLUIPA, a plaintiff can challenge a government action that "imposes" or "implements" a land use regulation that discriminates against any assembly or institution on the basis of religion. 42 U.S.C. § 2000cc(b)(2). Here, Plaintiffs allege at least three instances in which the Parish has violated this provision within the RLUIPA limitations period (since March 21, 2019) by *imposing* a land use regulation in a discriminatory manner: once on March 25, 2019,[6] then again on May 20, 2019,[7] and again on July 31, 2023. Pls.' Br. 49.[8] Contrary to the Parish's characterization, this count is not based on the claim that the current Land Use Plan is facially religiously discriminatory (Def.'s Br. 63), as the Parish scrubbed the Plan of the explicitly discriminatory buffer zones preferencing Catholic churches, but rather that its *imposition* of the regulation in March and May of 2019, and in July of 2023, is discriminatory.

## II. PLAINTIFFS SUFFICIENTLY PLEAD STANDING.

The Parish's arguments that Plaintiffs do not sufficiently plead standing fails. At the outset, the Parish has not contested the district court's ruling that all Plaintiffs properly plead health-related injuries, and that Inclusive Louisiana properly pleads property injuries. Nor could it, as Plaintiffs' Complaint details ample support for those harms.

Further, contrary to the Parish's arguments, all Plaintiffs amply plead religious injury, and Mount Triumph and RISE amply plead property injuries.

Finally, the Parish mischaracterizes the harms Plaintiffs plead and the claims to which they relate: First, the Parish wrongly suggests their harms were limited to three categories: property damage, health injuries, and religious injury. Def.'s Br. at 21. In fact, as argued in greater detail below, Plaintiffs also clearly plead environmental and aesthetic harms, ROA.741-742 [¶¶606-612], and stigmatic harm. *See infra* Section II(D). Second, the Parish wrongly limits what claims the injuries give rise to. For instance, health injuries also relate to others of Plaintiffs' claims, including Claim I (Thirteenth Amendment). But the Parish asserts that injury supports only Claims I and II. Def.'s Br. 21.

---

6       The Parish argues that because Syngas has not begun construction, there is no actionable harm. Def.'s Br. 64. But the harm is the discriminatory imposition of a land use regulation, which occurred at the moment Syngas's application was approved by the Parish, and is sufficient to establish standing. *See infra* Section II(D).

7       The Parish argues that the decision by the Planning Commission to approve Wanhua's land use application is not actionable because Wanhua withdrew its application. Even if this were so, it is nonetheless further evidence of continuing discrimination with knowledge and intent.

8       Contrary to the Parish's argument, an "appellate court may take judicial notice of facts, even if such facts were not noticed by the trial court." *United States v. Herrera-Ochoa*, 245 F.3d 495, 501 (5th Cir. 2001).

## A. Plaintiffs' Religious Injuries Are Traceable to the Parish.

1. The Parish Seeks to Impose an Unsupported Heightened Traceability Standard.

The Parish insists that, although it has permitted the construction of industrial facilities on top of cemeteries of enslaved people, the actual and threatened destruction, desecration, and lack of access to cemeteries is not traceable to the Parish because third parties take the final step of effectuating the construction. Def.'s Br. 24. This is contrary to clear Supreme Court precedent that to satisfy traceability Plaintiffs need not show that the Parish's "actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

The Parish fails to distinguish the cases cited by Plaintiffs where courts have held that injuries ultimately caused by third parties are nonetheless traceable to entities that regulate those parties. *See* Pls.' Br. 52, 56-57. The Parish does not address *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, where the Seventh Circuit held that the plaintiff satisfied traceability because:

> While the Secretary may not be the only party responsible for the injury alleged here, a plaintiff does not lack standing merely because the defendant is one of several persons who caused the harm . . . . The Secretary's silent approval caused that potential [harm] to become a reality because, but for her approval, the compact [between the third parties] would have no effect.

422 F.3d 490, 500-501 (7th Cir. 2005). Similarly here, without the Parish's approval, no third party would be permitted to construct a facility on a cemetery.

The Parish insists that *Pye* is distinct because plaintiffs there owned the property on which the threatened historic site was located, Def.'s Br. 26, but that fact had no bearing on the court's traceability analysis, although the fact that they were *adjacent* landowners was relevant to its injury-in-fact analysis. *Pye v. United States*, 269 F.3d 459, 467 (4th Cir. 2001). The holding relevant to *traceability* was that "but for the improvements on the road authorized by the [defendant's] permit," which was to be constructed by a *third party* (the county), "the injuries the Pyes complain of . . . have less probability of occurring." *Id*. at 471. The Parish makes no attempt to distinguish the traceability analysis in that case.

While it is true, as the Parish argues, Def.'s Br. 16, that procedural injuries such as those alleged in *Center for Biological Diversity v. U.S. Fish & Wildlife Service*, a case cited by Plaintiffs, lessen a plaintiff's burden regarding traceability, 807 F.3d 1031 (9th Cir. 2015), that case nonetheless confirms that traceability can be satisfied even where third parties later in the chain of causation contribute to the injury at issue. *Id*. at 1044 (although non-federal entities were the ones ultimately pumping groundwater, injury to plaintiffs' interest in endangered fish caused by groundwater pumping project was traceable to federal entity, where agreement between federal and non-federal entities related to the project included inadequate

conservation measures). And the chain in that case was arguably far more

attenuated. *Id*.[9]

     2.  <u>Plaintiffs Have Shown Religious Injury-In-Fact; to the Extent the Parish Raises 12(b)(6) Arguments Regarding Claim V, They Are Unavailing.</u>

Plaintiffs allege they have suffered at least two forms of religious injuries-in-

fact for purposes of Claim V and VII: (1) the destruction and desecration of

cemeteries, and (2) the inability to access, visit, and care for those cemeteries. Pls.'

Br. 55-56. The Parish does not contest that these are generally cognizable injuries-

in-fact, though like the district court, ROA.1013-1014, it characterizes Plaintiffs'

injury as being limited to an "inability to access" cemeteries, disregarding the

injury resulting not just from lack of access, but from the cemeteries' destruction

and desecration. Def's. Br. 22.

Additionally, the Parish inexplicably states that RLUIPA does not grant

"freestanding rights to obtain otherwise unavailable access to the real property of

others for religious use." Def.'s Br. 25. Plaintiffs have made no claim that it does.

To the extent that the Parish is making a 12(b)(6) argument that Plaintiffs are not

---

[9]    Defendants also attempt to distinguish *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167 (2000), by arguing that in that case the injury was traceable to the private entity defendant, but Plaintiffs rely on that case not for their traceability argument, but rather for the holding that lessening of aesthetic and recreational values of an area (in this case, the impact on cemeteries) is sufficient injury-in-fact. Pls.' Br. 55-56. The same is true of Plaintiffs' reliance on *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287, 1289 (4th Cir. 1992) and *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006).

"claimants" for the purposes of Claim V under RLUIPA, which requires that a claimant must allege an "ownership, leasehold, *easement, servitude, or other property interest*" in the land at issue (42 U.S.C. § 2000cc–5(5)(emphasis added), they are wrong.[10] Under Louisiana law, "once real estate is set apart and used for a final resting place of the dead, the owner cannot thereafter make another use of it"; and although descendants "do not own, in a strict legal sense, an interest in the cemetery, they do have a 'species of interest or form of title' therein." *Humphreys v. Bennett Oil Corp.*, 195 La. 531, 549 (La. 1940).[11] This constitutes a property interest sufficient to satisfy the expansive definition of "claimant" under RLUIPA.

The Parish does not contest that descendant communities by law have a property interest in land that is dedicated for cemetery purposes, but argues that the cemeteries at issue have not been so dedicated. Def.'s Br. 25. But under Louisiana law *formal* dedication is not required. *Humphreys*, 195 La. at 540. In *Thomas v. Mobley*, the court found that a plantation cemetery had in fact been dedicated when "commencing in slavery days, a tract of about an acre in extent had been used for burial purposes" by Black families residing on or near the plantation, and

---

[10]    In any event, the district court did not address this question, and this Court also should not. *Romero v. United States*, 784 F.2d 1322, 1325 (5th Cir. 1986) (declining to decide an issue left open by the district court because it was "best addressed in the first instance by the trial court, which may decide to develop the record before deciding this issue.").

[11]    The Attorney General has recognized this as comparable to the "rights of a dominant servitude holder over a servient estate" that extend to "descendants and friends." La. Atty. Gen. Op. No. 08-0186 at 1-2, available at http://www.lcb.state.la.us/ago/ago08-0186.pdf.

"[r]elatives of those interred in the . . . Cemetery continued to be buried therein up to 1948." 118 So. 2d 476, 478 (La. App. 1 Cir. 1960). This was true even though "by 1956 the graveyard, although readily distinguishable from the surrounding pasture, had become overgrown" and otherwise deteriorated. *Id.* The facts of *Mobley* are virtually indistinguishable from what Plaintiffs allege regarding the cemeteries at issue in this case. ROA.712-731 [¶¶474-539]. This is sufficient for the Court to draw a plausible inference that the land has been dedicated for cemetery use, and that Plaintiffs, as descendants of people enslaved in the Parish, have a property interest in them. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter, accepted as true" that allows a court "to draw the reasonable inference that defendant is liable").

## B. Plaintiffs' Injuries Are Actionable Under Article XII, Section 4, of the Louisiana Constitution.

As Plaintiffs already argued, the aesthetic injuries at issue here are cognizable harms. Pl.'s Br. 55-56. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000). As such, these injuries can form the basis of Plaintiffs' Louisiana Constitutional claim (Claim VII) for violation of their right to "preserve, foster, and promote their respective historic linguistic and cultural origins . . . ." La. Const. Art. XII, § 4. Specifically, Plaintiffs' Complaint repeatedly alleges that "the Parish's land use pattern and practice caused historic, cultural, and aesthetic injuries by authorizing the

destruction of [Plaintiffs' and their members'] churches, schools, homes, neighborhoods, and ancestors' burial sites. ROA.741-742 [¶¶606-612]. This includes historic Black communities like Romeville ROA.728 [¶543], Freetown ROA.622-702 [¶¶84-90, 164, 202, 349, 366, 417, 424-425], Welcome ROA.688-721 [¶¶349, 363, 424-425, 505], and Convent ROA.643-669 [¶¶164, 187-188, 220-225, 274]. *In addition to* other harms discussed in Section II(A) *supra,* and contrary to the Parish's argument that this claim "suffers the same lack of causation *and* traceability," Def.'s Br. 27, if not for the Parish's land use permitting, heavy industry would not destroy or threaten to destroy historically and culturally significant sites—sites that the Plaintiffs have repeatedly put the Parish on notice about. ROA.731 [¶551]. As such, Plaintiffs' aesthetic injuries, cognizable under clearly-established law, are caused by the Parish's violation of the Louisiana Constitution.

## C. Contrary to the Parish's Feigned Ignorance, the Complaint Demonstrates Causation for the Property Injuries Suffered by All Three Plaintiffs and Their Members.

The Parish did not challenge the district court's ruling finding property injury standing as to Plaintiff Inclusive Louisiana, essentially conceding that the district court got it right in that case. However, what makes the district court's ruling and Parish's argument so curious—and reversible—is that Plaintiffs clearly

plead facts showing similar property injuries and causation for both RISE St. James and Mount Triumph Baptist Church.

A "decrease in the market value of [property]" as a result of a zoning designation is "a sufficiently concrete injury for Article III purposes." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, n.1 (2018) (*citing Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926)). All Plaintiffs' assertions of lost property value are concrete and particularized injuries supporting standing. *See Markle Interests, L.L.C. v. U.S. Fish & Wildlife Serv.*, 827 F.3d 452, 463 (5th Cir. 2016), (reversed on other grounds, *Weyerhaeuser*, 586 U.S. 9 (2018)); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992).

Feigning ignorance of Plaintiffs' allegations, the Parish claims that they failed to "draw[] a factual connection between alleged decreased property values and actions of the Parish with any level of specificity." Def.'s Br. 29. Plaintiffs carefully spell out a pattern and practice of discriminatory land use decisions by the Parish that resulted in the property injuries suffered by the Plaintiffs. For instance, Plaintiffs plead that RISE founder and member Sharon Lavigne complained to the Parish about its discriminatory siting of polluting industry damaging property values. ROA.685 [¶¶338-339]. And that, for Mount Triumph and its congregants, the discriminatory land use pattern and practice has "resulted in diminution in the value of property." ROA.732-733 [¶559]. *See also* Pl.'s Br.

59-60. These allegations satisfy the modest burden on a plaintiff at this stage, and demonstrate that the Parish's conduct caused the injury to property values pleaded by all three Plaintiffs. *See Resnick v. AvMed, Inc.*, 693 F. 3d 1317, 1324 (11th Cir. 2012).

The Complaint paragraphs quoted by the Parish illustrates this contrived ignorance. Def.'s Br. 29. Paragraph 417 gives the example of the expansion of the Ergon tank farm adjacent to Mount Triumph Baptist Church–permitted by the Parish. The very next paragraph that the Parish quotes, Paragraph 559, states "[t]he discriminatory land use system has also resulted in diminution in the value of property owned by Plaintiffs, their members and *congregants* . . . ." *Id.* (emphasis added). The connection between the two is clear: Mount Triumph's property injury stems from the Parish's scheme of granting land use permissions for polluting industry in a manner that discriminates against Black residents and their places of worship, including Baptist churches. The Complaint clearly alleges a property injury traceable to the Parish's conduct for all three Plaintiffs.

### D. The Parish Has Personally Denied Plaintiffs Equal Treatment in a Manner that is Concrete, Particularized, and Actual, Giving Rise to Stigmatic Harm.

Both the district court and the Parish suggest that Plaintiffs' allegations of unequal treatment are too "broad" despite numerous specific, detailed allegations in the Complaint. ROA.1005. Def.'s Br. 17, 30. Indeed, Plaintiffs clearly meet

each of the *Lujan* requirements of: (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555 560 (1992) (internal citations and quotation marks omitted), and plead ample facts supporting "personal[] denial of equal treatment." *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017). In contrast to what this Court held was lacking in *Moore,* Plaintiffs here allege that the Parish repeatedly and intentionally directed, and continues to direct, actual unequal treatment at them as residents of the majority-Black Fourth and Fifth districts, and as Black constituents of those districts seeking protection from their elected officials, and that these decisions have resulted in concrete and particularized harms to their health, and property, in addition to their right to be free of the stigma of racial and religious discrimination.

First, as Plaintiffs extensively detailed in their opening brief, the Parish has repeatedly steered harmful industrial development to the districts where members and congregants of the Plaintiff organizations and other Black residents live, while protecting predominantly-white districts. Pl.'s Br. 62-63. This directed, discriminatory action has occurred after and in spite of individual members of Plaintiffs pleading, for years, with the Parish for protection. "[T]heir concerns fell on deaf ears," ROA.699 [¶405], while they witnessed their white neighbors receive respect, consideration, and protection from industrial siting—including, at times, in the very same Parish Council meeting. ROA. 683-686 (describing solar

moratorium implementation at the request of white residents and simultaneous denial of Plaintiffs' request for industrial siting moratorium).

Second, the Parish restricted Plaintiff Inclusive Louisiana members' use of their property in the Plan—restrictions imposed on only a few Parish residents that personally impact their ability to use their land as they freely choose. And third, the Parish has subjected Mount Triumph and other Baptist churches to industrial encroachment, while shielding their Catholic counterparts.

Critically, the Parish does not deny this conduct, Def.'s Br. 62-63, but merely asserts that this treatment is not sufficiently personal to warrant the stigma, not to mention the other harms, felt by members of the Plaintiff organizations. Def.'s Br. 32. For Plaintiffs, this is agonizing, dehumanizing, and existential: "How many more. . . have to die because of [the Parish]?" ROA.685-686 [¶341]; "Why does it always have to be us?" ROA. 691 [¶371].

Additionally, the Parish's discussion of *Heckler v. Mathews* misconstrues the core standing-related holding of that case. The Parish urges, nonsensically, that the Court's discussion of non-economic injuries applies to redressability alone, and that "this analysis cannot be applied to determine whether there is injury." Def.'s Br. 30. The *Heckler* Court makes no such distinction and indeed was clear when it wrote that unequal treatment that "stigmatiz[es] members of [a] disfavored group . . . can cause serious non-economic injuries[.]" 465 U.S. 728, 739 (1984). These

injuries are redressable because they are cognizable as concrete harms giving rise to standing in the first instance. As in *Heckler,* the Parish directly subjected Plaintiffs' members and congregants to a policy and practice that has treated, and continues to treat, them unequally and perpetuates stigma. They have been directly targeted and harmed as a result. The stigma amply pled by Plaintiffs is not severable from the unequal treatment they receive, and because they have been personally subjected to it, it is a concrete, particularized injury.

## III.   ISSUES NOT ADDRESSED BY THE DISTRICT COURT

In the face of a lengthy, fact-filled statement of the basis for the Claims, the Parish suggests that Plaintiffs failed to state Claims I-IV and Claim VI, as a substantive matter, under Fed. R. Civ. Proc. 12(b)(6) (Def.'s Br. 47-51, 53-59, 61, 64-65), an issue that was not addressed in the district court's ruling.

To begin, the fact- and time-intensive question of whether these claims should be dismissed on alternative 12(b)(6) grounds is best addressed in the first instance by the district court, which dismissed those claims on statute of limitations grounds only and did not address the remainder of the Parish's arguments. *Romero,* 784 F.2d at 1324-25 (declining to decide an issue left open by the district court because it was "best addressed in the first instance by the trial court, which may decide to develop the record before deciding this issue").

In any case, in the course of making these alternative 12(b)(6) arguments, the Parish ignores and mischaracterizes what is actually in the Complaint. Plaintiffs extensively briefed these arguments below, highlighting how facts alleged in the Complaint meet or exceed what is required under 12(b)(6) to state these particular claims.

Indeed, the district court noted the "unusual level of detail in the 155-page amended complaint" and "extensive historical recounting" when it denied the Parish's motion to strike, noting that the Parish failed to show "how the details are immaterial or impertinent to Plaintiffs' claims." ROA.1001. The court held that granting the Parish's motion to strike would require it to "improperly determine a disputed question: whether local history influenced Defendants' intent." *Id.* In raising these 12(b)(6) issues here, the Parish asks this Court to do the same: improperly determine a disputed question, while masking it as an argument about the sufficiency of the pleadings. In the face of so many detailed factual allegations supporting the claims, the Parish's argument is baseless, and this Court should reject it.

**A. Claim I, Thirteenth Amendment: Plaintiffs Sufficiently Plead Facts Demonstrating That the Land Use System in St. James Parish is a Badge or Incident of Slavery in Violation of the Thirteenth Amendment.**

The Complaint sets out in detail, and Plaintiffs extensively briefed below, how the discriminatory land use pattern, practice, and policy in effect in St. James today is directly traceable to the slavery system and its afterlife in St. James specifically, as an ongoing "badge or incident" of slavery, in violation of the Thirteenth Amendment. ROA.902-907. As Plaintiffs previously briefed, the Parish relies almost exclusively (Def.'s Br. 47) on the outdated and largely discredited Thirteenth Amendment holding of the *Civil Rights Cases,* 109 U.S. 3 (1883)–a decision that condoned and enabled racial discrimination and segregation in public accommodations and led to the Jim Crow era–to argue for a limitation on the definition of badges or incidents of slavery that has been repudiated by subsequent Supreme Court decisions. ROA.902-904 (Plaintiffs' lower court brief noting line of Supreme Court and circuit cases that broaden definition of "badges or incidents" of slavery to include, *inter alia,* the exclusion of Black people from white communities, racially motivated private violence, and school segregation).

Plaintiffs extensively plead and briefed before the district court how the present-day discriminatory land use system in St. James is closely linked and directly traceable to the system of slavery as it operated in St. James specifically,

with its after-effects reverberating through the Black Codes, Reconstruction, and Jim Crow up through to today when the Parish uses its political power to racialize land use decisions that uniformly harm Black residents, while protecting white residents. ROA.904-906.

Given all of the detailed factual allegations situating the discrimination Plaintiffs face today as a badge or incident of the slavery system as those terms have been defined and understood by modern jurisprudence, the Parish's motion was rightly not countenanced by the district court and should not be considered by this Court.

## B. Claim II, Equal Protection: Plaintiffs Sufficiently Plead Facts Demonstrating Racially Discriminatory Impact / Unequal Treatment *and* Racially Discriminatory Intent.

Defendant's argument that "facts regarding a discriminatory intent or lack of equal treatment were not pled," Def.'s Br. 43, borders on the frivolous given the numerous and detailed factual allegations showing just that.

### 1. Unequal Treatment / Racial Discrimination

The Complaint discusses *at length* how Black residents in the Fourth and Fifth districts have been, and continue to be, subjected to unequal treatment on the basis of race, i.e., racial discrimination, in violation of the Equal Protection clause of the Fourteenth Amendment. Whether official action "bears more heavily on one race than another," is "an important starting point" in determining whether a

violation of Equal Protection has occurred. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977) (citation and internal quotations omitted). As this Court has held, suspect classifications may be facial (when a categorization appears in the language of legislation or regulation) or *de facto* (for example, through a pattern, practice, or policy of enforcement that disparately impacts a discernible group). *Johnson v. Rodriguez,* 110 F.3d 299, 306 (5th Cir. 1997) (internal quotations and citations omitted).

Plaintiffs plead exhaustively–and the Parish barely contests–how the Parish's land use pattern, practice, and policy has borne more heavily on residents in the majority-Black Fourth and Fifth districts and on Plaintiffs' health, environment, property, and religion. *See, e.g.,* ROA.605-727 [¶¶23-25, 251, 258-259, 336-339, 433-466 (environment, health, property), 24, 190, 199, 281, 303, 375, 393, 465, 508-539 (religion)]. And they plead that the racial discrimination they suffer has been achieved through a pattern, practice, and policy. This pattern, practice, and policy has at times not been codified (ROA.646-669 [¶¶187-274]) (beginning in the 1960s, industry begins moving into the Parish with the approval, acquiescence, and assistance of Parish officials); Pls.' Br. 41-42 (land use approvals by the Parish that are inconsistent with the Land Use Plan). And at times the practice has been codified in facially discriminatory law (ROA.671-673 [¶¶280-288]) (explicit buffer zones protecting white Catholic churches, tourist

plantations, and some schools, but not Black or Baptist churches or schools)), or in facially neutral law (*see, e.g.*, ROA.671-672 [¶¶280-284]) (designations of large swaths of Fourth and Fifth districts as industrial or future industrial); ROA.677 [¶303] (discriminatory exclusion of Black and Baptist churches and schools continues after 2018 amendments to Plan). Significantly, more recently the Parish has persisted in discriminatory land use decision-making in ways that sidestep its own law, by not adhering to the limited requirements of the Parish ordinance. Pls.' Br. 41-42; *supra* Section I(A)(1).

The Parish attempts to rely on an irrelevant and unreported district court decision that did not involve a claim of race discrimination, nor discrimination on the basis of any other suspect, or even quasi-suspect, classification for its argument that Plaintiffs failed to sufficiently plead unequal treatment. Def.'s Br. 54 (citing *Wheelahan v. City of New Orleans,* No. 19-11720, 2020 WL 1503560 (E.D. La. Mar. 30, 2020)). Misappropriating *Wheelahan,* which appears to be a "class-of-one" claim on behalf of a resident claiming unequal enforcement of short-term rental regulations in a particular New Orleans district, *id*. at *6, the Parish attempts to narrow the viewfinder in this case to suggest that Plaintiffs must show that residents *within* the Fourth District have been treated unequally *as compared to each other.* Def.'s Br. 56-57. Plaintiffs' claims are clear, however, that when looking at the Parish as a whole, it is residents in the majority-Black Fourth and

Fifth districts who have been treated unequally as compared to residents in the majority-white parts of the Parish. And, in contrast to the claims in *Wheelahan*, Plaintiffs here claim discrimination on the basis of race in the land use pattern, practice, and policy of the Parish. Factors such as race "are so seldom relevant to the achievement of any legitimate state interest that [government actions] grounded in such considerations are deemed to reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985) (reiterating that suspect classifications are subject to strict scrutiny).

That is precisely what the factual allegations in the Complaint demonstrate: that Plaintiffs and residents in the majority-Black Fourth and Fifth districts have been subjected to racial discrimination, and have been deemed, over and over again, to be less worthy of the Parish's protection than residents in the majority-white parts of the Parish in terms of their health and well-being, ability to worship, and to commemorate and gather at the burial sites of ancestors. ROA.666-742 [¶¶260-274, 300, 433-551, 603, 607-608]. Plaintiffs demonstrated in their briefing below that the Complaint details extensively how this unequal treatment has manifested and the harms that result. ROA.907-908, 911 (summarizing allegations that 2014 Land Use Plan was further evidence of intentional discrimination and unequal treatment, and even after amending the Plan in 2018 to remove some of

the facially discriminatory elements, the Parish continued its pattern, practice, and policy by ignoring or overriding the requirements of its own ordinance to continue siting heavy industrial facilities in the Fourth and Fifth districts).

2. Plaintiffs Sufficiently Plead Discriminatory Intent or Purpose, Addressing *All* of the Non-Exhaustive *Arlington Heights* Factors.

Plaintiffs set out numerous and detailed facts in their Complaint that demonstrate that the discrimination they face is intentional. Plaintiffs also exhaustively and painstakingly briefed this issue below and, given space limitations, will summarize that briefing here. As can be seen in the Complaint and briefing, the Parish's arguments in this regard are baseless.

As the Supreme Court has held, while proof of racially discriminatory intent or purpose is required to show an Equal Protection violation, a plaintiff is not required to prove that the challenged action "rested solely," or even primarily, "on racially discriminatory purposes." *Arlington Heights,* 429 U.S. at 265; *United States v. Brown,* 561 F.3d 420, 433 (5th Cir. 2009). "Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence." *Hunt v. Cromartie,* 526 U.S. 541, 553 (1999). Thus, the Supreme Court has adopted a series of factors to guide the determination of discriminatory intent or purpose. *Veasey v. Abbott,* 830 F.3d 216, 230-31 (5th Cir. 2016) (en banc) (plurality opinion).

As Plaintiffs demonstrated in their briefing below, the Complaint includes numerous factual allegations that speak to *all* of the non-exhaustive *Arlington Heights* factors, including: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history . . . ." *Id. See* ROA.908-915 (Plaintiffs' briefing below). In addition, foreseeability of discriminatory impact is another factor that can be considered consistent with the *Arlington Heights* analysis, and Plaintiffs have pointed to multiple factual allegations showing that the impacts have also been readily foreseeable. *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 464-65 (1979). *See* ROA.915 (Plaintiffs' briefing below).

Cumulatively, *Arlington Heights* factors assess whether there is a consistent, historical, or recent pattern of discriminatory conduct by a decisionmaker. *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 223 (4th Cir. 2016). Plaintiffs demonstrated below how the factual allegations in the Complaint match up to each of these factors to reveal a clear pattern, practice, and policy of discriminatory conduct by the Parish that is intentional. ROA.908-915.

**C. Claim III, Substantive Due Process: Strict Scrutiny, Not Rational Basis, Applies to Reviews of Bodily Integrity Claims, Which Plaintiffs Have Sufficiently Pled.**

Defendant wrongly argues that a lower level of scrutiny applies to Plaintiffs' substantive due process claim, in suggesting that Plaintiffs have failed to state this claim. Def.'s Br. 48. It is well established, however, that strict scrutiny applies to substantive due process violations of fundamental rights, and state laws or actions which impinge on such rights must be suitably tailored to serve a compelling state interest. *City of Cleburne,* 473 U.S. at 440. The right to bodily security and integrity is among the fundamental rights subject to strict scrutiny. *Guertin v. Michigan,* 912 F.3d 907, 919 (6th Cir. 2019) (collecting cases). *See also, Tyson v. Sabine*, 42 F.4th 508, 517 (5th Cir. 2022); *Riggins v. Nevada*, 504 U.S. 127, 133-35 (1992). The Parish's suggestion that the rational basis level of review applies to Plaintiffs' bodily integrity claim, Def.'s Br. 57-59, is clearly in error as this test only applies to "substantive due process claims that do not implicate a fundamental right." *Reyes v. N. Texas Tollway Auth*, 861 F.3d 558, 561 (5th Cir. 2017). In any case, conduct that shocks the conscience, i.e., is deliberately indifferent, cannot even survive rational basis review. *See Brennan v. Stewart*, 834 F.2d 1248, 1256 (5th Cir. 1988).

None of the cases that the Parish cites are based on violations of a fundamental right. *Petroplex Int'l v. St. James Parish,* 158 F. Supp. 3d 537, 542

(E.D. La. 2016), upon which the Parish relies (Def.'s Br. 59), involved a corporation's challenge to an individual land use decision in St. James–the clear province of rational basis–not that the Land Use Plan was evidence of a consistent pattern and practice of violating a fundamental right to bodily integrity.

The violation of the right to bodily safety and integrity includes the right to be free from the intrusion of harmful contaminants into one's body. *Guertin*, 912 F.3d at 918-22 (residents of Flint, Michigan had fundamental right to be free from government knowingly and intentionally introducing harmful contaminants into water supply); *Williams ex rel. J.W. v. City of Jackson,* 663 F.Supp.3d 624, 640 (S.D. Miss. 2023) ("right to bodily integrity is violated when the government induces unwitting citizens to consume lead-contaminated water without their consent"). State officials violate this fundamental right "when their conduct is 'arbitrary, or conscience shocking[.]'" *Hitt v. McLane*, 854 Fed. App'x. 591, 596 (5th Cir. 2021) (internal citations omitted); *see also Stukenberg ex rel. M.D.*, 907 F.3d 237, 251 (5th Cir. 2018). Actions may shock the conscience if they are (1) "intended to injure in some way unjustifiable by any government interest" or if they (2) "resulted from deliberate indifference," which requires plaintiffs to allege facts indicating a state actor "consciously disregard[ed] a known and excessive risk to the victim's health and safety." *Stukenberg ex rel. M.D.*, 907 F.3d at 251-52

(internal quotations omitted). *See also Farmer v. Brennan,* 511 U.S. 825, 837 (1970).

Plaintiffs plead in detail violations of their rights to bodily safety and integrity. *See, e.g.,* ROA.598-709 [¶¶ 5, 8, 9, 341, 354, 363, 379, 400-402, 433-460] (Plaintiffs and Plaintiffs' members alleging health impacts, including cancer and death of family and community members, due to Parish's pattern and practice of discriminatory siting). And they sufficiently plead in detail conscience-shocking conduct on the part of Parish officials. *See, e.g.,* ROA.598-735 [¶¶4-9, 23-25, 251-259, 338-466, 573] (despite knowledge of health risks and impacts, the Parish has continued to intentionally steer heavy industry into their Districts).

### D. Claim IV, 42 U.S.C. § 1982: Plaintiffs Sufficiently Pled Intentional Discrimination in the Violation of their Property Rights.

The facts set forth above, *supra* Section III(B), that support Plaintiffs' allegations showing intentional discrimination for their Equal Protection claim, are likewise sufficient to show discriminatory intent or purpose under the standards governing 42 U.S.C. § 1982.

### E. Claim VI, RLUIPA Nondiscrimination: Mount Triumph Has Sufficiently Pled an RLUIPA Discrimination Claim.

RLUIPA prohibits the "impos[ition] or implement[ation of] a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). The Parish asserts

without explanation that the decision to apply buffer zones to protect Catholic churches but deny them to Baptist churches is not an "action[] which discriminate[s] against any assembly or institution on the basis of religion . . . ." Def.'s Br. 64-65. The Parish did not raise this argument below and it is therefore waived. *In re Highland Cap. Mgmt., L.P.*, 74 F.4th 361, 369 (5th Cir. 2023). In any case, it is hard to understand how the decision to protect only Catholic churches and not Baptist ones is anything but discriminatory on the basis of religion.

Additionally, the basis of its argument that Mount Triumph is not a "claimant" (Def.'s Br. 64-65) is also unclear. Mount Triumph alleges that by denying its property the protection of buffer zones offered to Catholic churches, the Parish has allowed "dangerous land use development" near it, resulting in Mount Triumph being "surrounded by industry" that has "caused adverse impacts to its congregation, including the peaceful worship of the assembly and the health of its members." ROA.741 [¶¶601-603]. These allegations irrefutably state that Mount Triumph's use of its property–its church–has been impacted by the denial of buffer zones offered to Catholic churches, and that its congregation has as well.

## CONCLUSION

For the foregoing reasons, the district court judgment should be reversed, and the case remanded for further proceedings.

Respectfully submitted,

/s/Astha Sharma Pokharel

Clara Potter, La. Bar Roll No. 38377
Devin A. Lowell, La. Bar Roll No. 36555
TULANE ENVIRONMENTAL LAW CLINIC
6329 Freret St.
New Orleans, LA 70118
Tel.: (504) 865-5789
Fax: (504) 862-8721
dlowell@tulane.edu
cpotter2@tulane.edu

*Attorneys for RISE St. James*

Astha Sharma Pokharel
Baher Azmy
Sadaf Doost
Pamela C. Spees, La. Bar Roll No. 29679
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
Tel. & Fax (212) 614-6462
asharmapokharel@ccrjustice.org
bazmy@ccrjustice.org
sdoost@ccrjustice.org
pspees@ccrjustice.org

William P. Quigley (cooperating counsel),
La. Bar Roll No. 7769
Professor Emeritus
Loyola University College of Law
7214 St. Charles Avenue
New Orleans, LA 70118
Tel. (504) 710-3074
quigley77@gmail.com

*Attorneys for Plaintiffs Inclusive Louisiana and Mount Triumph Baptist Church*

**CERTIFICATE OF COMPLIANCE**

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's June 3, 2024 order (Doc. 78) because it contains 9,184 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman for text and 12-point Times New Roman for footnotes) using Microsoft Word (the same program used for the word count).

/s/Astha Sharma Pokharel
Astha Sharma Pokharel

**CERTIFICATE OF SERVICE**

Undersigned counsel hereby certifies that on June 26, 2024, this brief was served via the Court's CM/ECF Document Filing System upon all registered CM/ECF users in this appeal.

/s/Astha Sharma Pokharel
Astha Sharma Pokharel