# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2025

Lyle W. Cayce
Clerk

No. 23-30908

―――――――――

Inclusive Louisiana, *by and through their members*; Mount Triumph Baptist Church, *by and through their members*; RISE St. James, *by and through their members*,

*Plaintiffs—Appellants*,

*versus*

St. James Parish; St. James Parish Council; St. James Parish Planning Commission,

*Defendants—Appellees*.

―――――――――――――――――――――

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-987

―――――――――――――――――――――

Before Higginbotham, Stewart, and Haynes, *Circuit Judges*.

Carl E. Stewart, *Circuit Judge*:

Appellants, two faith- and community-based organizations and a church located in St. James Parish, Louisiana ("the Organizations"), sued St. James Parish, St. James Parish Council, and the St. James Parish Planning Commission (collectively, "the Parish") bringing seven claims for violations of their constitutional and statutory civil rights. The Organizations alleged that the Parish discriminates against them by directing hazardous industrial

No. 23-30908

facility development towards majority-Black districts and Black churches, where their members and congregants live. They further argued that the Parish authorizes industrial development that desecrates, destroys, and restricts access to the cemeteries of their enslaved ancestors. The district court dismissed each claim. For the reasons stated below, we REVERSE the district court's dismissal and REMAND for further proceedings consistent with this opinion.

## I.

### A. Factual Background

The Organizations in this case represent communities in St. James Parish, Louisiana, located within an 80-mile stretch of land colloquially referred to as "Cancer Alley."[1] Inclusive Louisiana is a nonprofit, faith-based, grassroots community advocacy organization that aims to protect St. James Parish from environmental harm. Mount Triumph Baptist Church is a local congregation in St. James Parish. RISE St. James is a faith-based grassroots organization advocating for the end of petrochemical industries in St. James Parish. These Organizations claim that their members are residents of St. James Parish and descendants of individuals formerly enslaved within the Parish.

St. James Parish is divided into numbered districts. Most residents in the Fourth and Fifth Districts are Black.[2] Most residents in the Third and

---

[1] Because this appeal involves review of a motion to dismiss under Federal Rule of Civil Procedure 12(b), the facts presented herein are as alleged by the Organizations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] In 2010, the Fourth District was 61% Black, and the Fifth District was 87% Black. In 2020, the Fourth District was 52% Black, and the Fifth District was 89% Black.

No. 23-30908

Seventh Districts are White.[3] St. James Parish is also home to nearly two dozen large industrial facilities. The Parish has chosen to allow twenty of these industrial facilities in the majority-Black Fourth and Fifth Districts, whereas no new industrial facilities have been permitted to locate in the majority-White parts of the Parish in the last 46 years. The Fifth District—the district with the highest percentage of Black residents—has the highest rate of industrialization within St. James Parish. By contrast, the Third District, the district with the highest percentage of White residents, has the lowest rate of industrialization.

Notwithstanding pushback from residents, the Parish has granted every single request by corporations to locate their heavy industrial facilities in majority-Black districts in the Parish, while rejecting requests to locate those facilities in or near majority-White districts. In 2014, the Parish adopted a land use plan ("The Land Use Plan"), amended in 2018, designating large swaths of the Fourth and Fifth Districts as "Industrial" despite heavy residential concentration in those districts. The Land Use Plan also set out buffer zones protecting Catholic churches, schools, and tourist plantations from heavy industrial development in the White areas of the Parish, while providing no comparable buffer zone protection for Black churches and schools. The Organizations believe that The Land Use Plan "was . . . further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish" and "added even more methods of discriminating against Black residents and depriving them of their rights to equal protection of the laws, and nondiscrimination in the use and enjoyment of their property on equal terms of white citizens." The Organizations argue that the Parish's "land use decisions have been

---

[3] In 2020, the Third District and Seventh Districts were 84% White and 64% White, respectively.

made in a religiously discriminatory manner that burdens Black Baptist Churches but spares [W]hite Catholic churches." They further argue that the Parish's history of "racialized land use practices" has spawned several heavy industry facilities in their communities.

These facilities spew an array of highly dangerous air pollutants, including: particulate matter, ethylene oxide, benzine, formaldehyde, asbestos, styrene, toluene, ethyl benzine, ammonia, chlorine, ethyl dichloride, hydrogen sulfide, nitrogen dioxide, sulfur dioxide, carbon monoxide, and volatile organic chemicals. Data from the EPA shows that the majority-Black Fifth District ranks in the 89th percentile in Louisiana and the 95th-100th percentile nationwide for "Air Toxic Cancer Risk," which is defined as the risk of developing cancer from exposure to toxic air pollution, and in the 90th percentile statewide for "Air Toxic Respiratory Hazard." The neighboring majority-White Third District, by contrast, ranks in the 34th percentile for Air Toxic Cancer Risk and in the 20th percentile for "Air Toxics Respiratory Risks" statewide.[4]

The pollutants generated by the industrial facilities within St. James Parish pose severe health risks, including respiratory and cardiovascular disease, brain damage, lung and tissue damage, increased risk of death from COVID-19, and various forms of cancer. The Organizations cite studies showing that the elevated risk of cancer from air pollution is linked to higher cancer incidence among Black communities across Louisiana, including one analysis that they believe estimates that toxic air pollution contributed to 850 additional cancer cases among disproportionately Black and impoverished communities in Louisiana over the past decade. The Organizations allege

_____

[4] The Organizations do not define the terms "Air Toxic Respiratory Hazard" and "Air Toxics Respiratory Risks."

that their members have suffered health impacts and several dozen deaths due to the presence of the industrial facilities within their community.

Myrtle Felton, a founding member of Inclusive Louisiana, lives between two heavy industry facilities and less than two miles from a massive radioactive, highly acidic waste lake. She lost her husband and three immediate family members to cancer within three months in 2014. Another founding member of Inclusive Louisiana, Gail LeBoeuf, lives one mile from a heavy industrial alumina plant. She was diagnosed with cancer in December 2022. RISE founding member, Sharon Lavigne, lives within the heavily industrialized Fifth District. She has several friends and neighbors who have cancer or have died from it and has been to many funerals of people within the Parish who lost their battle with cancer. Pastor Harry Joseph of Mount Triumph has witnessed cancer and other pollution-related illnesses plague residents and congregants of his church. The church is surrounded by oil tank farms, with one petroleum storage facility located within 200 yards. In June 2017, Pastor Joseph publicly shared that he "buried five residents in the past six months, all victims of cancer."

In addition to these severe health risks, the Organizations allege that the siting of industrial facilities—authorized by the Parish's land use practices—decreases the property values of their members' homes and restricts their ability to inherit, purchase, lease, sell, hold, and convey real and personal property. They allege that the Parish's land practices are discriminatory and are used to "intentionally continue to deplete property values of Black residents while protecting that of [W]hite residents." They further allege that the Parish's conduct has resulted in "diminution in the value of property owned by [the Organizations], their members and congregants . . . and by other Black residents, churches, and associations in the [Fourth] and [Fifth] Districts of St. James Parish." Both Felton and Barbara Washington, founding members of Inclusive Louisiana, assert that

the location of industrial facilities near their homes has affected their property values and made it such that they cannot afford to relocate, especially to homes with similar accommodations and family history. In the fall of 2019, LeBoeuf, a founding member of Inclusive Louisiana, and Lavigne, a founding member of RISE, sent a letter to their council members in the Fourth and Fifth Districts, respectively, requesting that they put the issue of a moratorium on the siting of new petrochemical facilities and expansions of existing facilities on the St. James Parish Council's (the "Council") agenda. They requested this moratorium because of "the alarming rates of cancer and other illnesses associated with pollution from area industry and depreciation of *their* property values." The Council ignored their request.

In addition to their health and property injuries, the Organizations allege that they have suffered religious injuries because of the Parish's land use practices. Those injuries stem from the alleged facts that (1) the Parish permits heavy industry development near Baptist and majority-Black churches, but not Catholic and majority-White churches, and (2) industrial facilities within the Parish have been built, or proposed to be built, on former plantations and cemeteries housing the remains of the Organizations' enslaved ancestors. The Organizations explain that many of these cemeteries are unmarked because when adults and children died during their enslavement, they were typically buried in unmarked cemeteries—usually at the back end of the plantation. Nonetheless, the Organizations have worked with archaeologists who, using cartographic regression analyses, have identified some of the hundreds of cemeteries of enslaved people in St. James Parish. Additionally, Louisiana's chief archaeologist, Dr. Chip McGimsey, has stated "with almost 100% certainty" that there is "going to be a slave cemetery" on "every plantation that existed." These archaeological investigations support the Organizations' allegations that the Parish's land

use decisions and practices have led to the desecration and destruction of ancestral burial sites. The Organizations argue that the desecration, destruction, and inaccessibility of these cemeteries limits their religious exercise because it precludes not only their ability to access and visit, but also to recover, consecrate, and commemorate ancestral cemeteries known to exist within the Parish.

### B. Procedural History

On March 21, 2023, the Organizations sued the Parish. In their Amended Complaint, the Organizations first laid out the extensive history of chattel slavery, segregation, Jim Crow, and racialized land use practices in St. James Parish and throughout the American South—arguing that this background provides context for their claims. The Organizations then recounted the introduction and proliferation of heavy industry within St. James Parish, depicting how the disproportionate impacts of heavy industry on Black communities within the Parish became increasingly clear in the 1980s and 1990s. The Organizations then outlined instances in the late 1990s and early 2000s where plans to build heavy industry facilities within St. James Parish were supported by the Parish but opposed by the minority communities living where those facilities would be built. The Organizations then described the adoption of The Land Use Plan in 2014, alleging that it was "facially discriminatory" and adopted to protect the interests of White residents in the Parish. Throughout the Amended Complaint, the Organizations outlined several instances of allegedly discriminatory land use practices by the Parish, some of which predate The Land Use Plan, some of which were consistent with the plan, and some of which were contrary to or independent of the plan.

With that foundation laid, the Organizations brought seven claims against the Parish for violating their constitutional and statutory civil rights. They labelled those claims as follows: (I) violation of the Thirteenth

No. 23-30908

Amendment (badge or incident of slavery), (II) violation of the Fourteenth Amendment (equal protection), (III) violation of the Fourteenth Amendment (substantive due process/bodily integrity), (IV) violation of 42 U.S.C. § 1982 (property rights), (V) violation of 42 U.S.C. § 2000cc, Religious Land Use and Institutionalized Persons Act ("RLUIPA") (substantial burden), (VI) violation of 42 U.S.C. §2000cc, RLUIPA (discrimination), and (VII) violation of Article XII Section 4 the Louisiana Constitution: the "Preservation of Linguistic and Cultural Origins" provision.

The Organizations seek various forms of nonmonetary relief against the Parish for the alleged violations, including but not limited to (1) a declaratory judgment declaring the Parish's policies, patterns, and customs of discriminatory land use as violative of the Organizations rights, (2) a judgment declaring invalid those provisions of the Land Use Plan that direct industrial development to the majority Black Fourth and Fifth Districts, (3) injunctive relief enjoining the Parish from siting more industrial facilities in the Fourth and Fifth District, and (4) injunctive relief enjoining the Parish "from continuing all policies, pattern and practices, and/or customs pertaining to the racially and religiously discriminatory land use system."

The district court dismissed the Organizations' claims with prejudice.[5] First, the district court held that (1) no appellants had standing to

---

[5] The district court also granted the Parish's motion to dismiss defendants St. James Parish Council and St. James Parish Planning Commission on the basis that they function as branches of the parish government and are not additional or separate governmental units with the power to sue or be sued. The Organizations considered those defendants to be "nominal defendants" and do not appeal the district court's ruling on that issue. Thus, this court need not address that aspect of the district court's ruling. For simplicity, however, we continue to use the term "the Parish" to describe the sole remaining defendant: St. James Parish.

sue for injuries related to unequal treatment, (2) only Inclusive Louisiana had standing to sue for property injuries, and (3) all appellants had standing to sue for health-related injuries. Second, the district court dismissed Claims V and VII with prejudice on the basis that the Organizations failed to sufficiently allege religious injury standing, holding that the inaccessibility of cemeteries where the Organizations' members' ancestors are buried is due to third parties, and thus the Organizations' alleged religious injuries are not fairly traceable to the Parish. Third, and most notably, the district court dismissed Claims I-IV and VI for failure to state a claim under Rule 12(b)(6), holding that those claims were based on a single discrete incident in the past—the Parish's adoption of The Land Use Plan in 2014—and thus, were time barred. The Organizations filed a timely notice of appeal.

## II.

On appeal, the Organizations raise four arguments. First, they argue that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds. Second, they argue that the district court erred in dismissing Claims V and VII with prejudice on the basis that the Organizations lack standing to assert religious injuries. Third, they argue that the district court erred in concluding that two appellants, Mount Triumph and RISE, did not sufficiently establish standing based on their property related injuries. And fourth, they argue that the district court erred in concluding that the Organizations failed to sufficiently allege standing based on stigmatic harm. We address each of these arguments in turn.

We review "a district court's ruling on a motion to dismiss de novo." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting

No. 23-30908

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A Rule 12(b)(1) motion to dismiss challenges the subject-matter jurisdiction of the federal court. *See* Fed. R. Civ. P. 12(b)(1). A district court's determination of subject-matter jurisdiction is generally reviewed *de novo. Williams v. Wynne*, 533 F.3d 360, 364–65 (5th Cir. 2008). Plaintiffs bear the burden of establishing subject-matter jurisdiction. *Castro v. United States*, 560 F.3d 381, 386 (5th Cir. 2009), *vacated on other grounds*, 608 F.3d 266 (5th Cir. 2010).

## III.

### A. Claims I-IV and VI

The Organizations argue that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds. We agree. Accepting the facts pleaded by the Organizations as true, the district court appears to have inaccurately concluded that the Organizations' alleged injuries stem from a single incident outside of the applicable limitations periods.

The Organizations do not contest the district court's holding that their claims under 42 U.S.C. § 1983 (Claim I: Thirteenth Amendment & Claims II/III: Fourteenth Amendment) and § 1982 (Claim IV) are subject to a one-year statute of limitations period. Similarly, the Organizations do not contest the district court's holding that their claim under RLUIPA's non-discrimination clause (Claim VI) is subject to a four-year limitations period. Instead, the Organizations disagree with the district court's finding that the Organizations' claims are "at their core . . . based on one discrete action by [the Parish]: the adoption in 2014 of the Land Use Plan." The Organizations argue that their claims instead challenge a "longstanding

No. 23-30908

pattern and practice of racially discriminatory land use decisions" where "at least one act in this pattern and practice occurred within the limitations period."[6] They are correct.

"[S]tatute of limitations begins to run at the time *the plaintiff* has the right to apply to the court for relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasis in original and internal quotation marks omitted). When a plaintiff alleges discrimination based on a defendant's single act, "the statute begins to run at the time of the act." *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733 (5th Cir. 1983). Here, the Organizations filed their Original Complaint against the Parish on March 21, 2023, alleging discrimination based on several acts by the Parish. Thus, their claims are not barred by the statute of limitations so long as those claims are supported by acts that occurred within one year of that date for Claims I-IV and within four years of that date for Claim VI.

As to Claims I-IV, the Organizations argue that they pleaded two acts occurring within the one-year limitation period that demonstrate the Parish's discriminatory land use practices: (1) the Parish's decision on August 17, 2022, to reject the Organizations' request for a moratorium on "polluting industry" in their majority-Black communities, and (2) the Parish's

---

[6] The Organizations also argue that their claims regarding the Parish's discriminatory land use decisions satisfy the statute of limitations through the "continuing violations doctrine." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023) ("The continuing violations doctrine is equitable in nature and extends the limitations period on otherwise time barred claims only when the unlawful . . . practice manifests itself over time, rather than as a series of discrete acts."). The Supreme Court has emphasized that equitable doctrines, like the continuing violations doctrine, should be invoked "sparingly." *See Texas v. United States*, 891 F.3d 553, 562 (5th Cir. 2018) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Because the Organizations allege acts within the applicable limitations periods for each of their claims, the statute of limitations does not bar suit for those claims. Thus, we need not assess the applicability of the continuing violations doctrine.

simultaneous grant of White residents' request for a moratorium on the solar industry. While it is unclear at this pleading stage whether these alleged incidents of discrimination can ultimately prove a violation of the Organizations' constitutional or statutory rights, as alleged they plainly fall within the applicable one-year limitations period.

As to Claim VI, the Organizations argue that they pleaded that at least two acts related to their RLUIPA discrimination claim occurred within the four-year limitation period: (1) in May 2019, the Parish approved a land use permit for Wanhua Chemical US Operations ("Wanhua") to build a polyurethane manufacturing facility on a former plantation within one mile of the Organizations and a historically majority-Black Baptist Church, and (2) in May 2019, the Parish affirmed the approval of Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in the Fifth District near Mount Triumph. Again, these allegedly discriminatory acts plainly fall within the applicable statute of limitations period.

Notwithstanding these punctual allegations, the Parish argues that the Organizations' claims are time-barred because their alleged injuries stem solely from the Parish's 2014 Land Use Plan. That argument fails for two reasons.

First, the Parish is incorrect that all of the Organizations' alleged injuries stem from The Land Use Plan. The Organizations' Amended Complaint is replete with allegations of discriminatory land use decisions. The Organizations allege the following:

- In 1966, Parish officials met with officials of Freeport Sulphur Co. to discuss plans to develop a phosphoric acid complex in the majority-Black Fourth District, on a former plantation. That complex is now the site of a "massive radioactive, highly acidic waste lake."

No. 23-30908

- In 1996, the Parish, through its president, encouraged Shintech Steel to build a poly-vinyl chloride plant in a heavily-polluted area where 95% of people living nearby were Black.
- In 2003, the Parish was criticized by the EPA for failing to identify environmental justice as a priority. The EPA recommended that the Parish "acknowledg[e] that all citizens should receive fair treatment and have opportunities for meaningful involvement in processes that affect their health and welfare."
- In 2011, the Parish continued to encourage industrial development, including development by Nucor Steel—flagged by the EPA as a high priority Clean Air Act violator—in the majority-Black Fourth District.
- In 2013, the Parish passed a resolution opposing the proposed site for a crude oil terminal project (the "Wolverine Project") in the 84% White Third District.
- In April 2014, The Parish adopted The Land Use Plan.
- On April 23, 2014, the Parish approved South Louisiana Methanol's ("SLM") plans to build a methanol plant in the Parish's majority-Black Fifth District, within a mile of Mount Triumph Baptist Church.
- In December 2014, the Parish used the 2014 Land Use Plan to prevent the construction of a petroleum tank farm ("Petroplex"), part of which would be located in 64% White South Vacherie (located in the Sixth District).
- On March 25, 2015, the Parish approved the land use application of Yuhuang Chemical Industries Inc. ("Yuhuang") to build a plant. This approval "*directly conflicted* with the Land Use Plan because the property was in an area that was designated for residential growth, not industrial development, and because the construction of the plant would be within two miles of—in fact directly on top of—a high school."
- In August 2017, the Parish approved the land use application of Bayou Bridge Pipeline LLC to build a pipeline with an end-point near Mount Triumph Baptist Church and several churches, cemeteries, and residential neighborhoods in the Fifth District.

- In 2018, the Parish amended the 2014 Land Use Plan and thereby expanded the area designated for industrial development in the majority-Black Fifth District by encroaching on an area that in 2014 was designated for residential growth (an area that included St. James High School).

- In May 2018, the Parish permitted SLM to purchase land in the majority Black Fifth District even though the 2018 amendments to the Land Use Plan changed that land's designation from "future industrial" to "residential growth." The Parish treated SLM's project as "grandfathered" in under the 2014 Land Use Plan, even though SLM had yet to purchase the property. This treatment was in contrast to the way the Parish treated the Wolverine Project, which was proposed to be built in the 84% white majority Third District.

- In 2018, the Parish approved a land use application by Wanhua, which sought to operate in the majority-Black Fourth District, even though it failed to include information required by the Parish's 2018 amended land use regulations about public establishments, parks, playgrounds, churches, schools and community centers within the Project's two-mile impact area.

- In August 2018, the Parish approved the land use application of Ergon St. James Inc. ("Ergon") for an expansion of its crude oil terminal and tank farm located just 500 feet from Mount Triumph Baptist Church near the historic community of Freetown, and on the site of a former plantation. The approval "*directly conflicted* with the Land Use Plan, both under the 2014 Plan and as amended in 2018, because the property is in an area that is designated for agricultural use."

- On January 24, 2019, the Parish approved Formosa Plastics's land use application to build a 2,400-acre chemical manufacturing complex located in the majority-Black Fifth District, on the sites of former plantations despite being notified that Formosa made a series of misrepresentations in its application about measures it took to mitigate harm to a nearby elementary school and church in the majority-Black Fifth District.

- On March 24, 2019, the Parish approved Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in St. James Parish, likely on site of a former plantation, even though

No. 23-30908

Syngas failed to include information required by the Parish's 2018 amended land use regulations about public establishments, parks, playgrounds, churches, schools and community centers within the project's two-mile impact area.

- On August 17, 2022, the Parish rejected the Organizations' request for a moratorium on "polluting industry" in their majority-Black communities.
- On August 17, 2022, the Parish amended the Land Use Plan to enact a moratorium on solar farms at the request of residents in the majority-White part of the Parish. This amendment occurred after solar power companies proposed two large-scale solar power farms near the majority-White South Vacherie, located in the Sixth district.

As discussed, some of these decisions appear to have been consistent with The Land Use Plan; but many were not. The Organizations pleaded allegations of the Parish's discriminatory land use decisions that predate the 2014 Land Use Plan. The Organizations also pleaded allegations of the Parish's discrimination that were independent of the plan—such as their allegations regarding moratorium requests. Further, the Organizations alleged that the Parish made discriminatory land use decisions that were directly contrary to The Land Use Plan.[7] For these reasons, the Organizations allege that The Land Use Plan was merely "further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish" and "added even more methods of discriminating against Black residents and depriving them of their rights to equal protection of the laws, and nondiscrimination in the use and enjoyment of their property on equal terms of [W]hite citizens."

---

[7] As discussed, the Organizations allege that the Parish approved applications by Ergon, Yuhuang, Wanhua, and Syngas despite the fact that those applications failed to include information required by the Parish's land use regulations.

15

No. 23-30908

Second, even if the Parish is correct that the Organizations' allegations are all downstream of The Land Use Plan, that does not end our inquiry. Crucially, The Land Use Plan is not self-implementing. *See* La. Const. art. VI, § 17 (distinguishing, in separate clauses, between the abilities of municipalities to "(1) adopt regulations for land use zoning," and "(2) . . . implement those regulations"). Individual land use applications each require a distinct approval or rejection process. In this way, The Land Use Plan is merely a playbook for the Parish—its contents sketch out a general game plan for land use that the Parish aims to execute. Indeed, the Parish does not cite any case supporting the proposition that once a municipality's land use plan is beyond the statute of limitations, any claims arising from that municipality's individual land use decisions are time barred, regardless of when those decisions were made.

In sum, because the Organizations allege discriminatory acts that fall within the applicable limitations periods, their claims are not time barred. *See Perez*, 706 F.2d at 733. Thus, we hold that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds.[8]

### B. *Claims V and VII*

The Organizations argue that the district court erred in dismissing Claim V (RLUIPA's Substantial Burdens Clause) and Claim VII (La. Const. art. XII, § 4.) for lack of standing. We agree.

---

[8] The Parish provides alternative arguments in support of dismissal of Claims I-IV and VI. But none of those reasons were addressed by the district court. *Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 483 (5th Cir. 2006) (holding that, absent special circumstances that are inapplicable here, this court does not consider issues passed over by a district court). Thus, we decline to consider these alternative arguments and leave them for the district court to consider in the first instance.

No. 23-30908

To establish standing, plaintiffs must plead a concrete injury that is fairly traceable to the challenged conduct of the defendant and likely to be redressed by a favorable judicial decision.[9] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016); *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009). So long as "[d]efendants significantly contributed to the [p]laintiffs' alleged injuries, [p]laintiffs have satisfied the requirement of traceability." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). Indeed, to show traceability, there must merely be "a causal connection between the plaintiff's injury and the defendant's challenged conduct." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). That connection is present here.

The district court concluded that the Organizations' alleged injuries stem solely from their inability to physically access the cemeteries of their enslaved ancestors. In the district court's view, because private parties—not the Parish—control whether the Organizations may access the cemeteries, the injuries alleged by the Organizations are not fairly traceable to the Parish. Critically, however, the Organizations' Amended Complaint demonstrates that their alleged injuries for Claims V and VII go beyond a lack of physical access to their ancestors' cemeteries.

---

[9] We also note that in cases like this where the plaintiffs are organizations suing on behalf of their members, the organization must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). An organization is not required to specifically name its members to allege that those members have standing to sue. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024).

No. 23-30908

The Organizations explicitly allege religious, cultural, and aesthetic injuries which form the basis for Claims V and VII. These injuries include the alleged desecration, destruction, and inaccessibility of their ancestors' cemeteries by and through the Parish's land use practices. The Organizations argue that the Parish's conduct limits their religious exercise because it precludes their ability to locate, recover, access, consecrate, commemorate, and visit ancestral cemeteries known to exist in the Parish. These alleged injuries are directly traceable to the Parish's land use decisions because, by authorizing this "destruction" and "desecration" through its individual land use decisions, the Parish "significantly contributed" to harm that the Organizations allege they endured. *See LeBlanc*, 627 F.3d at 123. In limiting its inquiry to physical access of the cemeteries, the district court erroneously disregarded a swath of other alleged injures that are traceable to the conduct of the Parish. Moreover, the district court improperly narrowed the scope of the Organizations' allegations under RLUIPA's Substantial Burdens Clause and Section 4 of Article XII of the Louisiana Constitution.[10] As a result, the district court erred in determining that the Organizations lacked standing for Claims V and VII.

Further, the district court dismissed the Organizations' claims on this ground "with prejudice" despite its acknowledgment that "if a court lacks subject matter jurisdiction, it should dismiss without prejudice." *Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 468 (5th Cir. 2020) ("Ordinarily, when a complaint is dismissed for lack of jurisdiction, including lack of standing, it should be without prejudice." (internal quotation marks and citation omitted)). Because the Organizations' alleged

---

[10] Even assuming the Organizations' religious injuries were insufficient to establish standing, in dismissing Claim VII, the district court did not address the Organizations' alleged cultural and historical injuries under the Louisiana Constitution.

injuries are not merely related to physical access and are traceable to the conduct of the Parish, the district court improperly dismissed Claims V and VII with prejudice.

### C. *Property-Injury Standing*

The Organizations argue that the district court erred in determining that Mount Triumph and RISE did not sufficiently allege standing based on their property-related injuries. We agree.

As discussed, to establish standing, the Organizations must plead concrete injuries that are fairly traceable to the challenged conduct of the Parish and likely to be redressed by a favorable judicial decision. *See Spokeo*, 578 U.S. at 338; *Croft*, 562 F.3d at 745. They have each done so. As to RISE, the Organizations pleaded that RISE founder and member Lavigne complained to the Parish about its discriminatory siting of polluting industrial plants that damaged their property values. As to Mount Triumph, the Organizations pleaded that the Parish's discriminatory land use practices have "resulted in diminution in the value of property owned by . . . congregants." As the district court recognized, those allegations plainly constitute concrete injury because a "decrease in the market value of [property]" as a result of a zoning designation is "a sufficiently concrete injury for Article III purposes." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, n.1 (2018) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926))).

The Organizations alleged property injuries are also traceable to the conduct of the Parish. The district court's order did not meaningfully distinguish its traceability analysis for Inclusive Louisiana (for whom it found

traceability) from its analysis for the other appellants (for whom it did not).[11] Instead, the district court determined that "[the Organizations] d[id] not allege that [the Parish's] conduct significantly contributed to property injuries experienced by . . . Mount Triumph Baptist Church and RISE St. James." This determination, however, belies the Amended Complaint. In the Organizations' very first claim, they allege that "[t]he discriminatory land use system has also resulted in diminution in the value of property owned by [all appellants], their members and congregants." And in their fourth claim, they allege that the Parish has "devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that violates [their] rights . . . to inherit, purchase, lease, sell, hold, and convey real and personal property . . . resulting in lowered property values and other harms to their properties." Through these claims, the Organizations plainly allege "a causal connection" between their purported property injuries and the Parish's challenged conduct. *See Inclusive Cmtys. Project*, 946 F.3d at 655. Moreover, in alleging that the Parish's practices caused those injuries, the Organizations necessarily clear the lower hurdle of pleading that those practices "significantly contributed" to them. *See LeBlanc*, 627 F.3d at 123.

To be sure, perhaps each of the Organizations could have provided more detail on how the Parish's land use decisions have driven down the values of their properties. But neither the district court nor the Parish have cited any authority suggesting that Article III mandates additional specificity

---

[11] The district court noted that the Amended Complaint named two members of Inclusive Louisiana who alleged specific property injuries. Perhaps that makes those alleged injuries more detailed, but it does not make them any more traceable to the conduct of the Parish. Moreover, as discussed, the Organizations need not specifically name their allegedly injured members to establish standing. *See Nat'l Infusion Ctr. Ass'n*, 116 F.4th at 497 n.5.

No. 23-30908

to establish traceability. *See Bennett v. Spear*, 520 U.S. 154, 170–71 (1997) (explaining that a plaintiff's burden to establish traceability is "relatively modest" at the pleading stage). Because each appellant pleaded cognizable property injuries that are traceable to the conduct of the Parish and redressable by the various forms of relief they seek from the court, the Organizations have sufficiently demonstrated standing for those alleged property injuries. *See Spokeo,* 578 U.S. at 338.

### D. *Stigmatic-Injury Standing*

The Organizations also argue that the district court erred in holding that they do not have standing based on stigmatic injury. We agree.

Stigmatic injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]" *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)) (rejecting a claim that the inclusion of the Confederate battle flag on the Mississippi state flag conferred standing under the Equal Protection Clause). "Classifications based on race carry a danger of stigmatic harm . . . [and] may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). But racial classification alone does not amount to a showing of individualized harm. *Moore,* 853 F.3d at 249 (citing *Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003)). To plead standing based on a stigmatic injury, plaintiffs must plead that they were personally subjected not merely to racial classification, but to discriminatory treatment. *Id.* Put another way, "when plaintiff[s] ground their equal protection injuries in stigmatic harm, they only have standing if they also allege discriminatory treatment." *Barber v. Bryant*, 860 F.3d 345, 356 (5th Cir. 2017).

No. 23-30908

The district court did not explicitly address whether the Organizations suffered a stigmatic injury. Instead, it briefly concluded that "alleging broadly unequal treatment as a basis for numerous claims does not suffice" to meet the Organizations' burden to establish standing.[12] Upon closer examination, however, the Organizations' allegations suffice to establish stigmatic injury.

To start, the Organizations alleged racial classification in the Parish's land use decisions. Moreover, the Organizations pleaded that those decisions have personally subjected them to unequal treatment because the Parish consistently steers hazardous industrial development toward the predominantly Black districts (where they reside and worship) while shielding predominantly White districts from industrial development.

Indeed, the Organizations' Amended Complaint is replete with allegations of such unequal treatment. *Supra* III.A. In a letter to the St. James Parish Council, LeBoeuf, founding member of Inclusive Louisiana, and Lavigne, founding member of RISE, said that "[i]t is painful to see a land use map that so clearly signals the disregard of *our* lives and communities . . . clearing the way for more industry, more pollution, and more harm." On a separate occasion, Lavigne pleaded with the council once more stating that "it seems like you all like to push everything in the 5th District. Why? Because of the minorities and because of the [B]lacks. I don't know what it would take for this council to stand with this community and stop granting permits to every company." Similarly, in a council meeting regarding an industrial project to be built within the Fourth and Fifth District, Pastor Joseph lamented, "[w]hy does it always have to be us?" These statements, juxtaposed with the Organizations' statements about how

_____

[12] The district court did not dismiss any claims based on this reasoning.

No. 23-30908

consistently the Parish heeds the concerns of its majority-White districts, demonstrate the Organizations' well-pleaded allegations that they were racially classified and denied equal treatment.

In sum, the Organizations have pleaded a stigmatic injury sufficient for Article III adjudication.

\*       \*       \*

Of course, whether the Organizations will prove their allegations or prevail on any of their claims remains to be seen. At this juncture, however, we merely acknowledge that they have standing to pursue them.

## IV.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.