# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

INCLUSIVE LOUISIANA, by and through their members; MOUNT TRIUMPH BAPTIST CHURCH, by and through their members; RISE ST. JAMES, by and through their members,

*Plaintiffs-Appellants*

V.

ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION

*Defendants-Appellees*

On appeal from United States District Court for the Eastern District of Louisiana, Case No. 2:23-cv-00987

## PETITION FOR PANEL REHEARING
## BY DEFENDANTS-APPELLEES, ST. JAMES PARISH

BY ATTORNEYS

John King, La. Bar No. 17004
Carroll Devillier, Jr., La. Bar No. 30477
Danielle L. Borel, La. Bar No. 35669
**BREAZEALE, SACHSE & WILSON, L.L.P.**
301 Main Street, 23rd Floor (70801)
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Facsimile: 225-381-8029

*Attorneys for St. James Parish*

5269810.v1

# <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1.    Inclusive Louisiana – Plaintiff-Appellant;

2.    Mount Triumph Baptist Church – Plaintiff-Appellant;

3.    RISE St. James – Plaintiff-Appellant;

4.    Baher Azmy, Sadaf Doost, Pamela C. Spees, Astha Sharma Pokharel, and William P. Quigley of Center for Constitutional Rights – Counsel for Plaintiffs-Appellants, Inclusive Louisiana and Mount Triumph Baptist Church;

5.    Clara Potter, Devin A. Lowell, Zoe Berg, and William Veazey of Tulane Environmental Law Clinic – Counsel for Plaintiffs-Appellants, RISE St. James;

6.    St. James Parish – Defendant-Appellee;

7.    Danielle Lauren Borel, John Baird King, Carroll Devillier, Jr. of Breazeale, Sachse & Wilson, L.L.P. – Counsel for Defendant-Appellant, St. James Parish;

5269810.v1

*s/ Carroll Devillier, Jr.*

**BREAZEALE, SACHSE & WILSON, L.L.P.**
301 Main Street, 23rd Floor (70801)
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Facsimile: 225-381-8029
Carroll Devillier, Jr., La. Bar No. 30477
carroll.devillier@bswllp.com
*Attorneys for St. James Parish*

# TABLE OF CONTENTS

**PAGE**

CERTIFICATE OF INTERESTED PERSONS ...................................................... ii

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF THE ISSUE .................................................................. 1

STATEMENT OF THE COURSE OF PROCEEDINGS AND
DISPOSITION OF THE CASE .................................................................. 1

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT OF THE
ISSUES ................................................................................................ 4

ARGUMENT AND AUTHORITIES .......................................................... 4

    I.    A REHEARING IS RQUESTED TO ADDRESS THE
        AMBIGUITY IN THE DECISION REGARDING THE
        VIABILITY OF UNTIMELY ALLEGATIONS .................................. 5

    II.   IF THE DECISION EXTENDED THE CONTINUING
        VIOLATION DOCTRINE TO THIS CASE, IT SHOULD BE
        REVERSED ........................................................................... 7

        A.   ........................................................................... 7

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 7

    III.  THERE IS NO LEGAL MECHANISM TO SAVE
        APPELLANTS' UNTIMELY ALLEGATIONS EXCEPT FOR
        THE CONTINUING VIOLATION DOCTRINE, WHICH IS
        LEGALLY INAPPROPRIATE ........................................................ 9

CONCLUSION ................................................................................... 15

ATTACHMENTS:

DECISION, dated April 9, 2025 ............................................................. 19

JUDGMENT, dated April 9, 2025 .......................................................... 44

5269810.v1

# TABLE OF AUTHORITIES

## Cases

*Boswell v. Claiborne Par. Det. Ctr.,* 629 Fed. App'x 580 (5th Cir. 2015) ..............8

*Doe v. United States*, 853 F.3d 792 (5th Cir. 2017), *as revised* (Apr. 12, 2017) ...................................................................................................................14

*Frank v. Xerox Corp*., 347 F.3d 130 (5th Cir. 2003) ................................................14

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................8, 13

*Hearn v. McCraw*, 856 F. App'x 493 (5th Cir. 2021) ................................. 1, 10, 11

*Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.,* 850 F.3d 731 (5th Cir. 2017), *as revised* (Mar. 13, 2017)..............................................8, 13

*Jones v. Lumpkin*, 2023 WL 3075063 (5th Cir. 2023) ............................................11

*Middaugh v. InterBank*, 528 F. Supp. 3d 509 (N.D. Tex. 2021) ............................10

*Nicholson v. W.L. York, Inc*., No. 23-20440, 2024 WL 913378 (5th Cir. Mar. 4, 2024) ............................................................................................................13

*Perez v. Laredo Junior Coll.,* 706 F.2d 731 (5th Cir. 1983) ...............................3, 8

*R.R. Tele'rs v. Ry. Express Agency, Inc.,* 321 U.S. 342 (1944) ..............................15

*Rushing v. Yazoo Cnty. by & through Bd. of Supervisors of Yazoo Cnty.*, 861 F. App'x 544 (5th Cir. 2021) ........................................................................11

*Texas v. United States*, 891 F.3d 553 (5th Cir. 2018)..........................................9, 10

*United States v. City of Parma, Ohio*, 661 F.2d 562 (6th Cir. 1981) .....................12

*United States v. Mitchell*, 327 F. Supp. 476 (N.D. Ga. 1971) ................................12

## Other Authorities

42 U.S.C. § 1982 ....................................................................................................2, 7

42 U.S.C. § 1983 .......................................................................................................11

42 U.S.C. § 2000 .........................................................................................................2

42 U.S.C. § 2000(c) ....................................................................................................2

42 U.S.C. § 2000e-5 ..................................................................................................13

42 U.S.C. § 2000e-6 ..................................................................................................13

42 U.S.C. § 3610 .......................................................................................................13

5269810.v1

42 U.S.C. § 3614 ..................................................................................................13

**<u>Rules</u>**

Federal Rules of Civil Procedure Rule 12 ................................................................3

5269810.v1

## STATEMENT OF THE ISSUE

The April 9, 2025 Decision reversed the District Court's dismissal of Appellants' claims as prescribed and appears to reinstate, in full, all of Appellants' claims even though the panel was only able to identify a handful of allegations which are timely. The only legal theory which allows untimely allegations to be prosecuted if a complaint also contains a timely allegation is the continuing violation doctrine. Despite stating that the continuing violation doctrine was not considered by the Court, the Decision seems to utilize and reply on this legal theory to reinstate all of Appellants' claims. The use of the continuing violation doctrine is not legally supportable and conflicts with the Fifth Circuit precedent of *Hearn v. McCraw*, 856 F. App'x 493 (5th Cir. 2021). A panel rehearing is warranted to clarify the panel's intention to limit Appellants' claims <u>only</u> to their timely allegations. If the panel's intention was to apply the continuing violation doctrine and/or allow the prosecution of untimely allegations, the panel is petitioned to reconsider that point of law which is directly contrary to this Court's decision in *Hearn*.

## STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE

Plaintiffs/Appellants, Inclusive Louisiana, Mount Triumph Baptist Church, and RISE St. James filed suit against St. James Parish alleging seven claims:

1. Claim I—violation of the Thirteenth Amendment (badge or incident of slavery),

2. Claim II—violation of the Fourteenth Amendment (equal protection),

5269810.v1

3. Claim III—violation of the Fourteenth Amendment (substantive due process/bodily integrity),

4. Claim IV—violation of 42 U.S.C. § 1982 (property rights of Black citizens),

5. Claim V—violation of 42 U.S.C. § 2000 Religious Land Use and Institutionalized Persons Act ("**RLUIPA**) (substantial burden),

6. Claim VI—violation of 42 U.S.C. § 2000(c), RLUIPA (discrimination), and

7. Claim VII—violation of the Louisiana Constitution, Preservation of Cultural Origins provision.

On July 17, 2023, Plaintiffs filed an Amended Complaint for Declaratory and Injunctive Relief (the "**Complaint**"). ROA.594-748.

Appellants' Complaint references the history of slavery in the United States and Louisiana and attempts to cast the actions of recent elected officials in that same light. The Complaint goes so far as to plainly state that the adoption of the Land Use Plan in 2014 (as amended in 2018) by these officials is "racial cleansing" revealing "an intention to erase" historic Black communities. ROA.669-70, ¶¶ 274-275. Importantly, the Complaint lacks allegations that any of these claims are asserted in a timely manner.

Defendant, St. James Parish (the **"Parish"**), filed a Re-Submitted[1] Rule 12 Motion to Strike Allegations and Dismiss Claims in response to the Complaint. St. James Parish presented arguments under Federal Rules of Civil Procedure Rules

---

[1] Plaintiffs amended their complaint after Defendant filed its Rule 12 motion; out of an abundance of caution, Defendant re-asserted its motion specific to the Amended Complaint.

5269810.v1

12(f), 12(b)(1), and 12(b)(6). The District Court correctly assessed the Complaint as failing to establish standing on several claims and failing to overcome the applicable statutes of limitations for others. As such, the District Court correctly dismissed Appellants' Claims V and VII for lack of standing and Claims I, II, III, IV, and VI as prescribed, with prejudice.[2] ROA.1033, 1035. Appellants' filed the underlying appeal to this Court.

On April 9, 2025, this panel issued the Decision. The Decision held that Appellants' claims were not prescribed, as determined by the District Court because, for each claim, Appellants had at least one allegation that occurred during the limitation period prior to the filing of the Complaint.[3] Decision, Doc. 109-1, pp. 10-13. The Decision stated that because the Appellants "allege discriminatory acts that fall within the applicable limitations periods, their claims are not time barred", citing *Perez,* 706 F.2d at 733. Doc. 109-1, p. 16. The Decision held "that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds." *Id*. In doing so, the Decision reinstated all of Appellants' claims and untimely allegations without limitation.

---

[2] The District Court also correctly granted St. James Parish's Rule 12(b)(6) motion dismissing nominal Defendants, St. James Parish Council and St. James Parish Planning Commission, which is now final.

[3] The Decision also found all three Appellants had standing for all claims asserted in the Complaint. While the Parish disagrees with this conclusion, it is not challenged in this request for an *en banc* review.

5269810.v1

## STATEMENT OF FACTS NECESSARY
## TO THE ARGUMENT OF THE ISSUES

Because the question raised in this Petition for Panel Rehearing is a legal and procedural question, only those facts discussed in the Decision are necessary to determine the issue presented, namely whether a panel rehearing is warranted to clarify the panel's intention to limit Appellants' claims only to their timely allegations or whether reversal of the Decision is necessary to correct the panel's use of the continuing violation doctrine to allow prosecution of untimely allegations.

## ARGUMENT AND AUTHORITIES

The Decision appears to reinstate all of Appellants' allegations, including untimely ones, as actionable even though nearly all of them relate to actions that occurred outside the applicable prescriptive periods.[4] A Rehearing is requested from this panel to clarify whether the Decision deemed all untimely allegations viable or preserved the Appellants claims *only* as to those actions which occurred within the applicable prescriptive periods. If this panel deems that all of Appellants' allegations are timely, which could only be accomplished through application of the continuing violation doctrine, it is respectfully submitted the panel's Decision should be reversed because the extension of the continuing violation doctrine is inconsistent with prior Fifth Circuit precedent and is unsupported by law.

---

[4] This Court noted that Appellants did not challenge the District Court regarding its legal conclusion that the applicable prescriptive periods are one year for Claims I, II, III, and IV and four years for Claims VI. Doc. 109-1, p. 10. By the same legal analysis, Claim VII is also subject to a one-year prescriptive period and Claim V is subject to a four-year prescriptive period.

5269810.v1

# I. A REHEARING IS REQUESTED TO ADDRESS THE AMBIGUITY IN THE DECISION REGARDING THE VIABILITY OF UNTIMELY ALLEGATIONS.

The Decision is unclear as to whether it is utilizing the continuing violation doctrine or if it finds only those actions within the applicable statute of limitations are viable. The Decision never states whether Appellants' claims are limited to only those timely allegations. If this Court's intention was not to allow Appellants to pursue all allegations, including those outside the statute of limitations, clarification of this matter would resolve the ambiguity and save the parties confusion on remand.

The District Court found that Appellants' "claims accrued when Plaintiffs became aware they suffered an injury or had sufficient information to know they were injured." ROA.1025-26. Appellants not only learned of the Land Use Plan in 2014 and its amendment in 2018 but actively participated in the public meetings and discussions that led to their adoption. The Land Use Plan was passed with all trappings of legislative due process. Appellants and their members participated in this process. Appellants cannot reasonably contend that this formal action by St. James Parish failed to place them on notice of their potential claims. Even if those actions are viewed as independent discrete acts, not tied directly to the 2014 or 2018 plan, those actions each individually prescribed before Appellants filed suit. Prior to 2014, there are no allegations of any actions taken by St. James Parish, but only discussions of actions taken by non-party private parties. Logically, the actions prior to the plan implementation in 2014 were discrete actions "that put Plaintiffs on

5269810.v1

notice to protect their rights, thereby starting the clock on prescription," and are undoubtedly outside of the one-year prescriptive period. ROA.1030. These were properly dismissed by the District Court as prescribed. ROA.1030.

As this Court noted, only actions within the prescriptive periods before the Complaint was filed are viable. Decision, Doc. 109-1, p. 11. Actions outside of the applicable prescriptive periods are untimely. As such, Appellants' claims should be dismissed as prescribed as to all allegations except the four allegations identified by this court, namely:

1. "the Parish's decision on August 17, 2022, to reject the Organizations' request for a moratorium on 'polluting industry' in their majority-Black communities;"

2. "the Parish's simultaneous grant of White residents' request for a moratorium on the solar industry;"

3. "in May 2019, the Parish approved a land use permit for Wanhua Chemical US Operations ("Wanhua") to build a polyurethane manufacturing facility on a former plantation within one mile of the Organizations and a historically majority-Black Baptist Church;" and

4. "in May 2019, the Parish affirmed the approval of Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in the Fifth District near Mount Triumph."

Decision, Doc. 109-1, pp. 11-12.

Because the Decision reversed the District Court's dismissal of Appellants' untimely claims without distinguishing between timely and untimely allegations, clarification from this panel is requested to establish that the District Court's

5269810.v1

dismissal of Appellants' claims is reversed only as to the four timely allegations, but the untimely allegations remain dismissed.

## II.   IF THE DECISION EXTENDED THE CONTINUING VIOLATION DOCTRINE TO THIS CASE, IT SHOULD BE REVERSED.

In finding the District Court erred in dismissing Appellants' claims as prescribed, the Decision noted that Appellants were "correct" when they argued that "a 'longstanding pattern or practice of racially discriminatory land use decisions' where 'at least one act in this pattern and practice occurred within the limitations period.'" Decision, Doc. 109-1, p. 10-11. This analysis is hornbook application of the continuing violation doctrine.  However, the Decision purports to decline to "assess the applicability of the continuing violation doctrine." Decision, Doc. 109-1, p. 11, n. 6. This assertion is directly contradicted by the substance of the Decision.

The Decision substantively agreed with Appellants' position that the continuing violation doctrine was applicable. The context in which Appellants made this assertion is as follows:

### STATEMENT OF ISSUES PRESENTED FOR REVIEW

Did the district court err in dismissing Claim I (Thirteenth Amendment), Claim II (Equal Protection), Claim III (Substantive Due Process - Bodily Integrity), and Claim IV (42 U.S.C. § 1982) on statute of limitations grounds by miscasting these claims as challenging a discrete act, when Plaintiffs clearly challenge a longstanding pattern and practice of racially discriminatory land use decisions, **which constitutes a continuing violation that cannot be dismissed as untimely because** at least one act in this pattern and practice occurred within the limitations period?

Appellants' Brief, Doc. 47, p. 11 (<u>emphasis</u> added). While the Decision quoted the underlined portion of Appellants' argument, it omitted the bolded legal analysis between those two phrase - "which constitutes a continuing violation that cannot be dismissed as untimely" - which very clearly implicates the continuing violation doctrine and presumes its application. In presenting its legal argument, Appellants' asserted:

> Under the continuing violations doctrine, courts should not dismiss a claim on statute of limitations grounds if it is premised, as Plaintiffs' claims are, on a historical pattern and practice of unlawful conduct, even if the conduct began prior to the limitations period, "as long as . . . at least one act which comprises the . . . claim is still timely." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.,* 850 F.3d 731, 736 (5th Cir. 2017), *as revised* (Mar. 13, 2017) (citation omitted). The critical question under the continuing violations doctrine is whether a claim is based on an "unlawful practice" that "manifested in a number of incidents," *Havens Realty Corp.,* 455 U.S. at 381, rather than being based on "discrete acts," *Heath,* 850 F.3d at 740. If the claim is based on a pattern and practice, or in other words if it is based "on the cumulative effect of a thousand cuts," *id.* at 737 (citation omitted), then the continuing violations doctrine applies. The Fifth Circuit has applied the continuing violations doctrine to § 1983 claims. *See, e.g., Perez v. Laredo Junior Coll.,* 706 F.2d 731, 734 (5th Cir. 1983) (§ 1983 equal protection claim); *Boswell v. Claiborne Par. Det. Ctr.,* 629 Fed. App'x 580, 583 (5th Cir. 2015) (§ 1983 medical care-related claim).

Appellants' Brief, Doc. 47, p. 34-35. It is abundantly clear from the law and Appellants' brief that claims based on a pattern of alleged discriminatory actions are timely where one of the alleged actions falls within the statute of limitations *if the continuing violation doctrine is utilized.*

Here, the Decision states the continuing violation doctrine is not being applied, but fails to dismiss the untimely claims or limit Appellants' claims in any way. The Decision references allegations from 1966 until 2022 as the basis for standing, implying those allegations are viable and timely. Decision, Doc. 109-1, pp. 12-14. While contradictory, it appears the Decision is in fact using the continuing violation doctrine to allow Appellants to pursue claims based on all its allegations, not just the timely allegations.

## III. THERE IS NO LEGAL MECHANISM TO SAVE APPELLANTS' UNTIMELY ALLEGATIONS EXCEPT FOR THE CONTINUING VIOLATION DOCTRINE, WHICH IS LEGALLY INAPPROPRIATE.

If the Decision intended to allow Appellants to pursue all allegations, including those outside the statute of limitations, then the Decision inappropriately utilized the continuing violation doctrine in contravention of numerous decisions from this Court and the Supreme Court of the United States. There is no legal support for the application of the continuing violation doctrine to Appellants' civil rights claims or zoning claims.

"The Supreme Court has stressed that the equitable version of the [continuing violation] doctrine should be invoked 'sparingly,' only when the situation calls for it." *Texas v. United States*, 891 F.3d 553, 562 (5th Cir. 2018). Aside from fair housing jurisprudence, "the continuing-violation doctrine, which most frequently applies in the employment-discrimination context, should not be invoked where the defendants took action that 'in fairness and logic,' should have alerted [the plaintiff]

to act years ago." *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 527 (N.D. Tex. 2021) (citing *Texas*, 891 F.3d at 562). This Court explained the applicable test for a continuing violation as follows:

> The Supreme Court has stressed that the equitable version of the doctrine should be invoked "sparingly," only when the situation calls for it. We have heeded this instruction: as we have repeatedly held, "[g]enerally, in determining if equitable tolling is appropriate, we focus the inquiry 'on what event, in fairness and logic, should have alerted the average lay person to act to protect his rights.'"

*Texas*, 891 F.3d at 562.The District Court correctly noted these limitations to the continuing violation doctrine, citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). ROA.1023-24. As such, the District Court found it inapplicable to Appellants' claims.

The District Court's reasoning is consistent with this Court's recent application of the continuing violation doctrine to the § 1983 claims raised in *Hearn v. McCraw*, 856 F. App'x 493 (5th Cir. 2021). In *Hearn,* the plaintiffs contended that their lifetime obligation to register with the State of Texas as known sex offenders was violative of their substantive due process rights under the Fourteenth Amendment of the U.S. Constitution through a 42 U.S.C. § 1983 suit. *Id.* at 495. Plaintiffs alleged their claims were timely under the continuing violation doctrine because the law, as adopted, required annual registration. *Id.* at 496. This Court noted that plaintiffs' claims accrued in "1997 (or 1998 at the latest) when the law changed….and Plaintiffs learned of the change," and "the fact that Plaintiffs must

register annually is not a continuing tort, but rather the continuing effects of an alleged harm." *Id.* For these reasons, this Court refused to apply the continuing violation doctrine. *Id.; see also, Jones v. Lumpkin*, 2023 WL 3075063 (5th Cir. 2023) (The plaintiff should have known about the institution's prayer oil policy in 2012 when he was reincarcerated and his inability to access "scented prayer oil from outside vendors in 2017 is not 'a continuing tort, but rather the continuing effects of an alleged harm' that existed when he was reincarcerated in 2012") (citing *Hearn*).

This Court applied the same rationale in rejecting a continuing-violation doctrine to a § 1983 claim, finding that new claims did not accrue each time the county issued a paycheck that was in line with the policy it passed, but that the passing of the alleged offending policy was the discrete act which put the plaintiff on notice and started the clock. *Rushing v. Yazoo Cnty. by & through Bd. of Supervisors of Yazoo Cnty.*, 861 F. App'x 544, 553 (5th Cir. 2021) (unreported). That same reasoning applies here.

Appellants argued the District Court's finding was incorrect because Appellants' challenge "the Parish's unlawful pattern, practice, and policy of discriminatory steering that began long before the Plan was adopted." Doc. 47, p. 33. Appellants addressed the prescriptive period issues in broad strokes, attempting to revive prescribed claims by arguing that the recent decisions of a democratically

elected parish government are a *continuation* of slavery and its artifices.[5] Appellants

inappropriately base their assertion of a pattern or practice to support a "continuing

violation" on *United States v. City of Parma, Ohio*, 661 F.2d 562, 573 (6th Cir. 1981)

(which cites *United States v. Mitchell*, 327 F. Supp. 476, 478 (N.D. Ga. 1971)). In

*City of Parma, Ohio*, the court declined to find that the fair housing action violation

claims were barred by the 180-day time limit contained in the act for the

"enforcement of private persons" because the suit had *not* been brought by a private

person, but was brought by the Attorney General, who was separately empowered

by legislation to bring a civil claim against any person "engaging in a pattern or

practice of resistance to the full enjoyment of any of the rights" of that act. *Mitchell*,

327 F. Supp. at 478, n.1. Nothing in *City of Parma, Ohio* creates a "pattern or

practice" or "continuing violation" exception to claims before this Court.

Moreover, there is no legal support for the extension of the continuing

violation doctrine to civil rights claims. Application of the continuing violation

doctrine to housing discriminatory "practices" or employment "practices" is

supported statutorily. *See* e.g., 42 U.S.C. § 3614; 42 U.S.C. § 3610; 42 U.S.C. §

2000e-6; and 42 U.S.C. § 2000e-5.

---

[5] This contention is patently absurd and inconsistent with the reality that the Parish, and the elected officials directing its affairs, have changed dramatically over the years. The Parish is not an autonomous body susceptible to continued discriminatory intent. Appellants' argument would make the Parish liable for *every action* during hundreds of years of activity complained of by Appellants. The law creates prescriptive periods and statutes of limitations to prevent precisely this type of untenable result.

Here, there is no statute that allows Appellants to ignore the clear prescriptive periods for their claims merely because they allege a pattern or practice. Recently, citing *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731 (5th Cir. 2017), this Court has confirmed that "the Supreme Court and this court have clarified, the continuing violation doctrine applies **only** in the context of hostile work environment claims, . . ." *Nicholson v. W.L. York, Inc.*, No. 23-20440, 2024 WL 913378, at *4 (5th Cir. Mar. 4, 2024) (unreported) (**emphasis** supplied). In *Heath,* this Court noted the distinction between discrete acts that form the basis of traditional discrimination claims from continuing conduct that forms the basis of hostile work environment claims, and explained:

> Claims alleging discrete acts are not subject to the continuing violation doctrine; hostile workplace claims are. **Hostile environment claims are "continuing" because they involve repeated conduct, so the "unlawful employment practice" cannot be said to occur on any particular day.** *Morgan*, 536 U.S. at 115–17, 122 S.Ct. 2061. As long as "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* As one circuit has helpfully described *Morgan*'s reasoning, a plaintiff's hostile environment claim "is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant," so "the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement."

850 F.3d at 373 (**emphasis** added).

Unlike the claims brought in *Nat'l R.R. Passenger Corp.* 536 U.S. at 116, *Heath*, 850 F.3d 731, and *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982),

Appellants' claims do not contain the "pattern or practice" element which exists in "hostile work environment claims."

Appellants' claims are not hostile work environment claims. None of Appellants' claims *require* proof of repeated conduct nor the creation of a particular *environment*. Appellants have alleged discrete acts of purported discrimination from multiple different sources and third parties and attempted to weave those into a pattern and practice of the Parish only to survive prescription. Appellants alleged multiple separate and discrete actions of multiple different actors occurring over many decades. Appellants were alerted to their claims years ago.

If Appellants' claims are viewed as repeated discrete actions, they would not support a finding of a continuing violation. "Discrete actions, even if 'serial,' 'are not entitled to the shelter of the continuing violation doctrine.'" *Doe v. United States*, 853 F.3d 792, 802 (5th Cir. 2017), *as revised* (Apr. 12, 2017) (citing *Nat'l R.R. Passenger Corp.* 536 U.S. at 113; *Frank v. Xerox Corp.*, 347 F.3d 130, 136 (5th Cir. 2003). The risk of misapplication of the continuing violation doctrine is clear here. If Appellants' reasoning were applied here, no land use decision of the Parish would *ever* be final. New plaintiffs – years (or even decades) from now – could challenge any land use decision based upon a broad interpretation of the continuing violation doctrine to superimpose historical wrongs from centuries past onto current and future land use decisions. This type of uncertainty created by the prosecution of aged theories of recovery is precisely the result that is intended to be prevented by the

5269810.v1

application of pertinent statues of limitations. *See Nat'l R.R. Passenger Corp.* 536 U.S. at 125 (O'Connor, J., concurring) (noting that statutes of limitations are "designed" to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared" (quoting *R.R. Tele'rs v. Ry. Express Agency, Inc.,* 321 U.S. 342, 348–49 (1944)).

Appellants' claims are untimely, and the requested application of the continuing violation doctrine does far too much harm to be equitably applied here. It is legally unsupportable to allow Appellants to utilize the continuing violation doctrine to breathe life into centuries worth of untimely allegations. As such, the panel should reverse the Decision which improperly applied the continuing violation doctrine to this case.

## CONCLUSION

The Decision appears to inappropriately reinstate the entirety of Appellants' claims without limitation. Such is not supported by law as nearly all Appellants' allegations are untimely, warranting dismissal. Alternatively, the only mechanism by which Appellants' claims can be saved is the continuing violation doctrine, which is also legally inappropriate. Therefore, a rehearing to clarify the extent of the Decisions' reversal is requested as well as a rehearing to reverse the Decision's utilization of the continuing violation theory, which is inconsistent with Fifth Circuit precedent and applicable legal principles.

15

Date: May 2, 2025

RESPECTFULLY SUBMITTED,

**BREAZEALE, SACHSE & WILSON, L.L.P.**
301 Main Street, 23rd Floor (70801)
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Facsimile: 225-381-8029

*s/ Carroll Devillier, Jr.*
John King, La. Bar No. 17004
John.King@bswllp.com
Carroll Devillier, Jr., La. Bar No. 30477
carroll.devillier@bswllp.com
Danielle L. Borel, La. Bar No. 35669
danielle.borel@bswllp.com
*Attorneys for St. James Parish*

16

## CERTIFICATE OF SERVICE

I hereby certify that on May 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/Carroll Devillier, Jr.*
Carroll Devillier, Jr.

5269810.v1

# CERTIFICATE OF COMPLIANCE

I hereby certify that the above and foregoing Petition for Rehearing *En Banc* on Behalf of Defendants-Appellees, St. James Parish, complies with the type-volume limitation contained in Fed. R. App. P. 40(d)(3). I used Times New Roman, 14-point font to prepare the brief. The brief consists of 3,678 total words. I relied upon the word and line count of Microsoft Office Word 365 in determining the count.

May 2, 2025

*s/Carroll Devillier, Jr.*
Carroll Devillier, Jr.

5269810.v1

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2025

Lyle W. Cayce
Clerk

No. 23-30908

---

INCLUSIVE LOUISIANA, *by and through their members*; MOUNT TRIUMPH BAPTIST CHURCH, *by and through their members*; RISE ST. JAMES, *by and through their members*,

*Plaintiffs—Appellants*,

*versus*

ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-987

---

Before HIGGINBOTHAM, STEWART, and HAYNES, *Circuit Judges*.

CARL E. STEWART, *Circuit Judge*:

Appellants, two faith- and community-based organizations and a church located in St. James Parish, Louisiana ("the Organizations"), sued St. James Parish, St. James Parish Council, and the St. James Parish Planning Commission (collectively, "the Parish") bringing seven claims for violations of their constitutional and statutory civil rights. The Organizations alleged that the Parish discriminates against them by directing hazardous industrial

No. 23-30908

facility development towards majority-Black districts and Black churches, where their members and congregants live. They further argued that the Parish authorizes industrial development that desecrates, destroys, and restricts access to the cemeteries of their enslaved ancestors. The district court dismissed each claim. For the reasons stated below, we REVERSE the district court's dismissal and REMAND for further proceedings consistent with this opinion.

## I.

### A. Factual Background

The Organizations in this case represent communities in St. James Parish, Louisiana, located within an 80-mile stretch of land colloquially referred to as "Cancer Alley."[1] Inclusive Louisiana is a nonprofit, faith-based, grassroots community advocacy organization that aims to protect St. James Parish from environmental harm. Mount Triumph Baptist Church is a local congregation in St. James Parish. RISE St. James is a faith-based grassroots organization advocating for the end of petrochemical industries in St. James Parish. These Organizations claim that their members are residents of St. James Parish and descendants of individuals formerly enslaved within the Parish.

St. James Parish is divided into numbered districts. Most residents in the Fourth and Fifth Districts are Black.[2] Most residents in the Third and

---

[1] Because this appeal involves review of a motion to dismiss under Federal Rule of Civil Procedure 12(b), the facts presented herein are as alleged by the Organizations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] In 2010, the Fourth District was 61% Black, and the Fifth District was 87% Black. In 2020, the Fourth District was 52% Black, and the Fifth District was 89% Black.

No. 23-30908

Seventh Districts are White.[3] St. James Parish is also home to nearly two dozen large industrial facilities. The Parish has chosen to allow twenty of these industrial facilities in the majority-Black Fourth and Fifth Districts, whereas no new industrial facilities have been permitted to locate in the majority-White parts of the Parish in the last 46 years. The Fifth District—the district with the highest percentage of Black residents—has the highest rate of industrialization within St. James Parish. By contrast, the Third District, the district with the highest percentage of White residents, has the lowest rate of industrialization.

Notwithstanding pushback from residents, the Parish has granted every single request by corporations to locate their heavy industrial facilities in majority-Black districts in the Parish, while rejecting requests to locate those facilities in or near majority-White districts. In 2014, the Parish adopted a land use plan ("The Land Use Plan"), amended in 2018, designating large swaths of the Fourth and Fifth Districts as "Industrial" despite heavy residential concentration in those districts. The Land Use Plan also set out buffer zones protecting Catholic churches, schools, and tourist plantations from heavy industrial development in the White areas of the Parish, while providing no comparable buffer zone protection for Black churches and schools. The Organizations believe that The Land Use Plan "was . . . further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish" and "added even more methods of discriminating against Black residents and depriving them of their rights to equal protection of the laws, and nondiscrimination in the use and enjoyment of their property on equal terms of white citizens." The Organizations argue that the Parish's "land use decisions have been

---

[3] In 2020, the Third District and Seventh Districts were 84% White and 64% White, respectively.

No. 23-30908

made in a religiously discriminatory manner that burdens Black Baptist Churches but spares [W]hite Catholic churches." They further argue that the Parish's history of "racialized land use practices" has spawned several heavy industry facilities in their communities.

These facilities spew an array of highly dangerous air pollutants, including: particulate matter, ethylene oxide, benzine, formaldehyde, asbestos, styrene, toluene, ethyl benzine, ammonia, chlorine, ethyl dichloride, hydrogen sulfide, nitrogen dioxide, sulfur dioxide, carbon monoxide, and volatile organic chemicals. Data from the EPA shows that the majority-Black Fifth District ranks in the 89th percentile in Louisiana and the 95th-100th percentile nationwide for "Air Toxic Cancer Risk," which is defined as the risk of developing cancer from exposure to toxic air pollution, and in the 90th percentile statewide for "Air Toxic Respiratory Hazard." The neighboring majority-White Third District, by contrast, ranks in the 34th percentile for Air Toxic Cancer Risk and in the 20th percentile for "Air Toxics Respiratory Risks" statewide.[4]

The pollutants generated by the industrial facilities within St. James Parish pose severe health risks, including respiratory and cardiovascular disease, brain damage, lung and tissue damage, increased risk of death from COVID-19, and various forms of cancer. The Organizations cite studies showing that the elevated risk of cancer from air pollution is linked to higher cancer incidence among Black communities across Louisiana, including one analysis that they believe estimates that toxic air pollution contributed to 850 additional cancer cases among disproportionately Black and impoverished communities in Louisiana over the past decade. The Organizations allege

_____

[4] The Organizations do not define the terms "Air Toxic Respiratory Hazard" and "Air Toxics Respiratory Risks."

4

that their members have suffered health impacts and several dozen deaths due to the presence of the industrial facilities within their community.

Myrtle Felton, a founding member of Inclusive Louisiana, lives between two heavy industry facilities and less than two miles from a massive radioactive, highly acidic waste lake. She lost her husband and three immediate family members to cancer within three months in 2014. Another founding member of Inclusive Louisiana, Gail LeBoeuf, lives one mile from a heavy industrial alumina plant. She was diagnosed with cancer in December 2022. RISE founding member, Sharon Lavigne, lives within the heavily industrialized Fifth District. She has several friends and neighbors who have cancer or have died from it and has been to many funerals of people within the Parish who lost their battle with cancer. Pastor Harry Joseph of Mount Triumph has witnessed cancer and other pollution-related illnesses plague residents and congregants of his church. The church is surrounded by oil tank farms, with one petroleum storage facility located within 200 yards. In June 2017, Pastor Joseph publicly shared that he "buried five residents in the past six months, all victims of cancer."

In addition to these severe health risks, the Organizations allege that the siting of industrial facilities—authorized by the Parish's land use practices—decreases the property values of their members' homes and restricts their ability to inherit, purchase, lease, sell, hold, and convey real and personal property. They allege that the Parish's land practices are discriminatory and are used to "intentionally continue to deplete property values of Black residents while protecting that of [W]hite residents." They further allege that the Parish's conduct has resulted in "diminution in the value of property owned by [the Organizations], their members and congregants . . . and by other Black residents, churches, and associations in the [Fourth] and [Fifth] Districts of St. James Parish." Both Felton and Barbara Washington, founding members of Inclusive Louisiana, assert that

the location of industrial facilities near their homes has affected their property values and made it such that they cannot afford to relocate, especially to homes with similar accommodations and family history. In the fall of 2019, LeBoeuf, a founding member of Inclusive Louisiana, and Lavigne, a founding member of RISE, sent a letter to their council members in the Fourth and Fifth Districts, respectively, requesting that they put the issue of a moratorium on the siting of new petrochemical facilities and expansions of existing facilities on the St. James Parish Council's (the "Council") agenda. They requested this moratorium because of "the alarming rates of cancer and other illnesses associated with pollution from area industry and depreciation of *their* property values." The Council ignored their request.

In addition to their health and property injuries, the Organizations allege that they have suffered religious injuries because of the Parish's land use practices. Those injuries stem from the alleged facts that (1) the Parish permits heavy industry development near Baptist and majority-Black churches, but not Catholic and majority-White churches, and (2) industrial facilities within the Parish have been built, or proposed to be built, on former plantations and cemeteries housing the remains of the Organizations' enslaved ancestors. The Organizations explain that many of these cemeteries are unmarked because when adults and children died during their enslavement, they were typically buried in unmarked cemeteries—usually at the back end of the plantation. Nonetheless, the Organizations have worked with archaeologists who, using cartographic regression analyses, have identified some of the hundreds of cemeteries of enslaved people in St. James Parish. Additionally, Louisiana's chief archaeologist, Dr. Chip McGimsey, has stated "with almost 100% certainty" that there is "going to be a slave cemetery" on "every plantation that existed." These archaeological investigations support the Organizations' allegations that the Parish's land

use decisions and practices have led to the desecration and destruction of ancestral burial sites. The Organizations argue that the desecration, destruction, and inaccessibility of these cemeteries limits their religious exercise because it precludes not only their ability to access and visit, but also to recover, consecrate, and commemorate ancestral cemeteries known to exist within the Parish.

### B. Procedural History

On March 21, 2023, the Organizations sued the Parish. In their Amended Complaint, the Organizations first laid out the extensive history of chattel slavery, segregation, Jim Crow, and racialized land use practices in St. James Parish and throughout the American South—arguing that this background provides context for their claims. The Organizations then recounted the introduction and proliferation of heavy industry within St. James Parish, depicting how the disproportionate impacts of heavy industry on Black communities within the Parish became increasingly clear in the 1980s and 1990s. The Organizations then outlined instances in the late 1990s and early 2000s where plans to build heavy industry facilities within St. James Parish were supported by the Parish but opposed by the minority communities living where those facilities would be built. The Organizations then described the adoption of The Land Use Plan in 2014, alleging that it was "facially discriminatory" and adopted to protect the interests of White residents in the Parish. Throughout the Amended Complaint, the Organizations outlined several instances of allegedly discriminatory land use practices by the Parish, some of which predate The Land Use Plan, some of which were consistent with the plan, and some of which were contrary to or independent of the plan.

With that foundation laid, the Organizations brought seven claims against the Parish for violating their constitutional and statutory civil rights. They labelled those claims as follows: (I) violation of the Thirteenth

No. 23-30908

Amendment (badge or incident of slavery), (II) violation of the Fourteenth Amendment (equal protection), (III) violation of the Fourteenth Amendment (substantive due process/bodily integrity), (IV) violation of 42 U.S.C. § 1982 (property rights), (V) violation of 42 U.S.C. § 2000cc, Religious Land Use and Institutionalized Persons Act ("RLUIPA") (substantial burden), (VI) violation of 42 U.S.C. §2000cc, RLUIPA (discrimination), and (VII) violation of Article XII Section 4 the Louisiana Constitution: the "Preservation of Linguistic and Cultural Origins" provision.

The Organizations seek various forms of nonmonetary relief against the Parish for the alleged violations, including but not limited to (1) a declaratory judgment declaring the Parish's policies, patterns, and customs of discriminatory land use as violative of the Organizations rights, (2) a judgment declaring invalid those provisions of the Land Use Plan that direct industrial development to the majority Black Fourth and Fifth Districts, (3) injunctive relief enjoining the Parish from siting more industrial facilities in the Fourth and Fifth District, and (4) injunctive relief enjoining the Parish "from continuing all policies, pattern and practices, and/or customs pertaining to the racially and religiously discriminatory land use system."

The district court dismissed the Organizations' claims with prejudice.[5] First, the district court held that (1) no appellants had standing to

---

[5] The district court also granted the Parish's motion to dismiss defendants St. James Parish Council and St. James Parish Planning Commission on the basis that they function as branches of the parish government and are not additional or separate governmental units with the power to sue or be sued. The Organizations considered those defendants to be "nominal defendants" and do not appeal the district court's ruling on that issue. Thus, this court need not address that aspect of the district court's ruling. For simplicity, however, we continue to use the term "the Parish" to describe the sole remaining defendant: St. James Parish.

sue for injuries related to unequal treatment, (2) only Inclusive Louisiana had standing to sue for property injuries, and (3) all appellants had standing to sue for health-related injuries. Second, the district court dismissed Claims V and VII with prejudice on the basis that the Organizations failed to sufficiently allege religious injury standing, holding that the inaccessibility of cemeteries where the Organizations' members' ancestors are buried is due to third parties, and thus the Organizations' alleged religious injuries are not fairly traceable to the Parish. Third, and most notably, the district court dismissed Claims I-IV and VI for failure to state a claim under Rule 12(b)(6), holding that those claims were based on a single discrete incident in the past—the Parish's adoption of The Land Use Plan in 2014—and thus, were time barred. The Organizations filed a timely notice of appeal.

## II.

On appeal, the Organizations raise four arguments. First, they argue that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds. Second, they argue that the district court erred in dismissing Claims V and VII with prejudice on the basis that the Organizations lack standing to assert religious injuries. Third, they argue that the district court erred in concluding that two appellants, Mount Triumph and RISE, did not sufficiently establish standing based on their property related injuries. And fourth, they argue that the district court erred in concluding that the Organizations failed to sufficiently allege standing based on stigmatic harm. We address each of these arguments in turn.

We review "a district court's ruling on a motion to dismiss de novo." *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020) (quoting *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting

No. 23-30908

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A Rule 12(b)(1) motion to dismiss challenges the subject-matter jurisdiction of the federal court. *See* Fed. R. Civ. P. 12(b)(1). A district court's determination of subject-matter jurisdiction is generally reviewed *de novo*. *Williams v. Wynne*, 533 F.3d 360, 364–65 (5th Cir. 2008). Plaintiffs bear the burden of establishing subject-matter jurisdiction. *Castro v. United States*, 560 F.3d 381, 386 (5th Cir. 2009), *vacated on other grounds*, 608 F.3d 266 (5th Cir. 2010).

### III.

#### A.  Claims I-IV and VI

The Organizations argue that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds. We agree. Accepting the facts pleaded by the Organizations as true, the district court appears to have inaccurately concluded that the Organizations' alleged injuries stem from a single incident outside of the applicable limitations periods.

The Organizations do not contest the district court's holding that their claims under 42 U.S.C. § 1983 (Claim I: Thirteenth Amendment & Claims II/III: Fourteenth Amendment) and § 1982 (Claim IV) are subject to a one-year statute of limitations period. Similarly, the Organizations do not contest the district court's holding that their claim under RLUIPA's non-discrimination clause (Claim VI) is subject to a four-year limitations period. Instead, the Organizations disagree with the district court's finding that the Organizations' claims are "at their core . . . based on one discrete action by [the Parish]: the adoption in 2014 of the Land Use Plan." The Organizations argue that their claims instead challenge a "longstanding

No. 23-30908

pattern and practice of racially discriminatory land use decisions" where "at least one act in this pattern and practice occurred within the limitations period."[6] They are correct.

"[S]tatute of limitations begins to run at the time *the plaintiff* has the right to apply to the court for relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasis in original and internal quotation marks omitted). When a plaintiff alleges discrimination based on a defendant's single act, "the statute begins to run at the time of the act." *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733 (5th Cir. 1983). Here, the Organizations filed their Original Complaint against the Parish on March 21, 2023, alleging discrimination based on several acts by the Parish. Thus, their claims are not barred by the statute of limitations so long as those claims are supported by acts that occurred within one year of that date for Claims I-IV and within four years of that date for Claim VI.

As to Claims I-IV, the Organizations argue that they pleaded two acts occurring within the one-year limitation period that demonstrate the Parish's discriminatory land use practices: (1) the Parish's decision on August 17, 2022, to reject the Organizations' request for a moratorium on "polluting industry" in their majority-Black communities, and (2) the Parish's

---

[6] The Organizations also argue that their claims regarding the Parish's discriminatory land use decisions satisfy the statute of limitations through the "continuing violations doctrine." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023) ("The continuing violations doctrine is equitable in nature and extends the limitations period on otherwise time barred claims only when the unlawful . . . practice manifests itself over time, rather than as a series of discrete acts."). The Supreme Court has emphasized that equitable doctrines, like the continuing violations doctrine, should be invoked "sparingly." *See Texas v. United States*, 891 F.3d 553, 562 (5th Cir. 2018) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Because the Organizations allege acts within the applicable limitations periods for each of their claims, the statute of limitations does not bar suit for those claims. Thus, we need not assess the applicability of the continuing violations doctrine.

simultaneous grant of White residents' request for a moratorium on the solar industry. While it is unclear at this pleading stage whether these alleged incidents of discrimination can ultimately prove a violation of the Organizations' constitutional or statutory rights, as alleged they plainly fall within the applicable one-year limitations period.

As to Claim VI, the Organizations argue that they pleaded that at least two acts related to their RLUIPA discrimination claim occurred within the four-year limitation period: (1) in May 2019, the Parish approved a land use permit for Wanhua Chemical US Operations ("Wanhua") to build a polyurethane manufacturing facility on a former plantation within one mile of the Organizations and a historically majority-Black Baptist Church, and (2) in May 2019, the Parish affirmed the approval of Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in the Fifth District near Mount Triumph. Again, these allegedly discriminatory acts plainly fall within the applicable statute of limitations period.

Notwithstanding these punctual allegations, the Parish argues that the Organizations' claims are time-barred because their alleged injuries stem solely from the Parish's 2014 Land Use Plan. That argument fails for two reasons.

First, the Parish is incorrect that all of the Organizations' alleged injuries stem from The Land Use Plan. The Organizations' Amended Complaint is replete with allegations of discriminatory land use decisions. The Organizations allege the following:

- In 1966, Parish officials met with officials of Freeport Sulphur Co. to discuss plans to develop a phosphoric acid complex in the majority-Black Fourth District, on a former plantation. That complex is now the site of a "massive radioactive, highly acidic waste lake."

No. 23-30908

- In 1996, the Parish, through its president, encouraged Shintech Steel to build a poly-vinyl chloride plant in a heavily-polluted area where 95% of people living nearby were Black.
- In 2003, the Parish was criticized by the EPA for failing to identify environmental justice as a priority. The EPA recommended that the Parish "acknowledg[e] that all citizens should receive fair treatment and have opportunities for meaningful involvement in processes that affect their health and welfare."
- In 2011, the Parish continued to encourage industrial development, including development by Nucor Steel—flagged by the EPA as a high priority Clean Air Act violator—in the majority-Black Fourth District.
- In 2013, the Parish passed a resolution opposing the proposed site for a crude oil terminal project (the "Wolverine Project") in the 84% White Third District.
- In April 2014, The Parish adopted The Land Use Plan.
- On April 23, 2014, the Parish approved South Louisiana Methanol's ("SLM") plans to build a methanol plant in the Parish's majority-Black Fifth District, within a mile of Mount Triumph Baptist Church.
- In December 2014, the Parish used the 2014 Land Use Plan to prevent the construction of a petroleum tank farm ("Petroplex"), part of which would be located in 64% White South Vacherie (located in the Sixth District).
- On March 25, 2015, the Parish approved the land use application of Yuhuang Chemical Industries Inc. ("Yuhuang") to build a plant. This approval "*directly conflicted* with the Land Use Plan because the property was in an area that was designated for residential growth, not industrial development, and because the construction of the plant would be within two miles of—in fact directly on top of—a high school."
- In August 2017, the Parish approved the land use application of Bayou Bridge Pipeline LLC to build a pipeline with an end-point near Mount Triumph Baptist Church and several churches, cemeteries, and residential neighborhoods in the Fifth District.

- In 2018, the Parish amended the 2014 Land Use Plan and thereby expanded the area designated for industrial development in the majority-Black Fifth District by encroaching on an area that in 2014 was designated for residential growth (an area that included St. James High School).

- In May 2018, the Parish permitted SLM to purchase land in the majority Black Fifth District even though the 2018 amendments to the Land Use Plan changed that land's designation from "future industrial" to "residential growth." The Parish treated SLM's project as "grandfathered" in under the 2014 Land Use Plan, even though SLM had yet to purchase the property. This treatment was in contrast to the way the Parish treated the Wolverine Project, which was proposed to be built in the 84% white majority Third District.

- In 2018, the Parish approved a land use application by Wanhua, which sought to operate in the majority-Black Fourth District, even though it failed to include information required by the Parish's 2018 amended land use regulations about public establishments, parks, playgrounds, churches, schools and community centers within the Project's two-mile impact area.

- In August 2018, the Parish approved the land use application of Ergon St. James Inc. ("Ergon") for an expansion of its crude oil terminal and tank farm located just 500 feet from Mount Triumph Baptist Church near the historic community of Freetown, and on the site of a former plantation. The approval "*directly conflicted* with the Land Use Plan, both under the 2014 Plan and as amended in 2018, because the property is in an area that is designated for agricultural use."

- On January 24, 2019, the Parish approved Formosa Plastics's land use application to build a 2,400-acre chemical manufacturing complex located in the majority-Black Fifth District, on the sites of former plantations despite being notified that Formosa made a series of misrepresentations in its application about measures it took to mitigate harm to a nearby elementary school and church in the majority-Black Fifth District.

- On March 24, 2019, the Parish approved Syngas Energy Holding, LLC's ("Syngas") proposal to build a methanol production plant in St. James Parish, likely on site of a former plantation, even though

Syngas failed to include information required by the Parish's 2018 amended land use regulations about public establishments, parks, playgrounds, churches, schools and community centers within the project's two-mile impact area.

- On August 17, 2022, the Parish rejected the Organizations' request for a moratorium on "polluting industry" in their majority-Black communities.
- On August 17, 2022, the Parish amended the Land Use Plan to enact a moratorium on solar farms at the request of residents in the majority-White part of the Parish. This amendment occurred after solar power companies proposed two large-scale solar power farms near the majority-White South Vacherie, located in the Sixth district.

As discussed, some of these decisions appear to have been consistent with The Land Use Plan; but many were not. The Organizations pleaded allegations of the Parish's discriminatory land use decisions that predate the 2014 Land Use Plan. The Organizations also pleaded allegations of the Parish's discrimination that were independent of the plan—such as their allegations regarding moratorium requests. Further, the Organizations alleged that the Parish made discriminatory land use decisions that were directly contrary to The Land Use Plan.[7] For these reasons, the Organizations allege that The Land Use Plan was merely "further evidence of the continuing racially discriminatory land use patterns and practices that already existed in St. James Parish" and "added even more methods of discriminating against Black residents and depriving them of their rights to equal protection of the laws, and nondiscrimination in the use and enjoyment of their property on equal terms of [W]hite citizens."

---

[7] As discussed, the Organizations allege that the Parish approved applications by Ergon, Yuhuang, Wanhua, and Syngas despite the fact that those applications failed to include information required by the Parish's land use regulations.

No. 23-30908

Second, even if the Parish is correct that the Organizations' allegations are all downstream of The Land Use Plan, that does not end our inquiry. Crucially, The Land Use Plan is not self-implementing. *See* La. Const. art. VI, § 17 (distinguishing, in separate clauses, between the abilities of municipalities to "(1) adopt regulations for land use zoning," and "(2) . . . implement those regulations"). Individual land use applications each require a distinct approval or rejection process. In this way, The Land Use Plan is merely a playbook for the Parish—its contents sketch out a general game plan for land use that the Parish aims to execute. Indeed, the Parish does not cite any case supporting the proposition that once a municipality's land use plan is beyond the statute of limitations, any claims arising from that municipality's individual land use decisions are time barred, regardless of when those decisions were made.

In sum, because the Organizations allege discriminatory acts that fall within the applicable limitations periods, their claims are not time barred. *See Perez*, 706 F.2d at 733. Thus, we hold that the district court erred in dismissing Claims I-IV and VI for failure to state a claim on statute of limitations grounds.[8]

B. *Claims V and VII*

The Organizations argue that the district court erred in dismissing Claim V (RLUIPA's Substantial Burdens Clause) and Claim VII (La. Const. art. XII, § 4.) for lack of standing. We agree.

---

[8] The Parish provides alternative arguments in support of dismissal of Claims I-IV and VI. But none of those reasons were addressed by the district court. *Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 483 (5th Cir. 2006) (holding that, absent special circumstances that are inapplicable here, this court does not consider issues passed over by a district court). Thus, we decline to consider these alternative arguments and leave them for the district court to consider in the first instance.

No. 23-30908

To establish standing, plaintiffs must plead a concrete injury that is fairly traceable to the challenged conduct of the defendant and likely to be redressed by a favorable judicial decision.[9] *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016); *Croft v. Governor of Texas*, 562 F.3d 735, 745 (5th Cir. 2009). So long as "[d]efendants significantly contributed to the [p]laintiffs' alleged injuries, [p]laintiffs have satisfied the requirement of traceability." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). Indeed, to show traceability, there must merely be "a causal connection between the plaintiff's injury and the defendant's challenged conduct." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). That connection is present here.

The district court concluded that the Organizations' alleged injuries stem solely from their inability to physically access the cemeteries of their enslaved ancestors. In the district court's view, because private parties—not the Parish—control whether the Organizations may access the cemeteries, the injuries alleged by the Organizations are not fairly traceable to the Parish. Critically, however, the Organizations' Amended Complaint demonstrates that their alleged injuries for Claims V and VII go beyond a lack of physical access to their ancestors' cemeteries.

---

[9] We also note that in cases like this where the plaintiffs are organizations suing on behalf of their members, the organization must demonstrate that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). An organization is not required to specifically name its members to allege that those members have standing to sue. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 497 n.5 (5th Cir. 2024).

17

No. 23-30908

The Organizations explicitly allege religious, cultural, and aesthetic injuries which form the basis for Claims V and VII. These injuries include the alleged desecration, destruction, and inaccessibility of their ancestors' cemeteries by and through the Parish's land use practices. The Organizations argue that the Parish's conduct limits their religious exercise because it precludes their ability to locate, recover, access, consecrate, commemorate, and visit ancestral cemeteries known to exist in the Parish. These alleged injuries are directly traceable to the Parish's land use decisions because, by authorizing this "destruction" and "desecration" through its individual land use decisions, the Parish "significantly contributed" to harm that the Organizations allege they endured. *See LeBlanc*, 627 F.3d at 123. In limiting its inquiry to physical access of the cemeteries, the district court erroneously disregarded a swath of other alleged injures that are traceable to the conduct of the Parish. Moreover, the district court improperly narrowed the scope of the Organizations' allegations under RLUIPA's Substantial Burdens Clause and Section 4 of Article XII of the Louisiana Constitution.[10] As a result, the district court erred in determining that the Organizations lacked standing for Claims V and VII.

Further, the district court dismissed the Organizations' claims on this ground "with prejudice" despite its acknowledgment that "if a court lacks subject matter jurisdiction, it should dismiss without prejudice." *Green Valley Special Util. Dist. v. City of Schertz, Texas*, 969 F.3d 460, 468 (5th Cir. 2020) ("Ordinarily, when a complaint is dismissed for lack of jurisdiction, including lack of standing, it should be without prejudice." (internal quotation marks and citation omitted)). Because the Organizations' alleged

---

[10] Even assuming the Organizations' religious injuries were insufficient to establish standing, in dismissing Claim VII, the district court did not address the Organizations' alleged cultural and historical injuries under the Louisiana Constitution.

injuries are not merely related to physical access and are traceable to the conduct of the Parish, the district court improperly dismissed Claims V and VII with prejudice.

### C. *Property-Injury Standing*

The Organizations argue that the district court erred in determining that Mount Triumph and RISE did not sufficiently allege standing based on their property-related injuries. We agree.

As discussed, to establish standing, the Organizations must plead concrete injuries that are fairly traceable to the challenged conduct of the Parish and likely to be redressed by a favorable judicial decision. *See Spokeo*, 578 U.S. at 338; *Croft*, 562 F.3d at 745. They have each done so. As to RISE, the Organizations pleaded that RISE founder and member Lavigne complained to the Parish about its discriminatory siting of polluting industrial plants that damaged their property values. As to Mount Triumph, the Organizations pleaded that the Parish's discriminatory land use practices have "resulted in diminution in the value of property owned by . . . congregants." As the district court recognized, those allegations plainly constitute concrete injury because a "decrease in the market value of [property]" as a result of a zoning designation is "a sufficiently concrete injury for Article III purposes." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, n.1 (2018) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926))).

The Organizations alleged property injuries are also traceable to the conduct of the Parish. The district court's order did not meaningfully distinguish its traceability analysis for Inclusive Louisiana (for whom it found

No. 23-30908

traceability) from its analysis for the other appellants (for whom it did not).[11] Instead, the district court determined that "[the Organizations] d[id] not allege that [the Parish's] conduct significantly contributed to property injuries experienced by . . . Mount Triumph Baptist Church and RISE St. James." This determination, however, belies the Amended Complaint. In the Organizations' very first claim, they allege that "[t]he discriminatory land use system has also resulted in diminution in the value of property owned by [all appellants], their members and congregants." And in their fourth claim, they allege that the Parish has "devised, implemented, enforced, encouraged, and sanctioned a policy, practice, and/or custom of land use that violates [their] rights . . . to inherit, purchase, lease, sell, hold, and convey real and personal property . . . resulting in lowered property values and other harms to their properties." Through these claims, the Organizations plainly allege "a causal connection" between their purported property injuries and the Parish's challenged conduct. *See Inclusive Cmtys. Project*, 946 F.3d at 655. Moreover, in alleging that the Parish's practices caused those injuries, the Organizations necessarily clear the lower hurdle of pleading that those practices "significantly contributed" to them. *See LeBlanc*, 627 F.3d at 123.

To be sure, perhaps each of the Organizations could have provided more detail on how the Parish's land use decisions have driven down the values of their properties. But neither the district court nor the Parish have cited any authority suggesting that Article III mandates additional specificity

---

[11] The district court noted that the Amended Complaint named two members of Inclusive Louisiana who alleged specific property injuries. Perhaps that makes those alleged injuries more detailed, but it does not make them any more traceable to the conduct of the Parish. Moreover, as discussed, the Organizations need not specifically name their allegedly injured members to establish standing. *See Nat'l Infusion Ctr. Ass'n*, 116 F.4th at 497 n.5.

No. 23-30908

to establish traceability. *See Bennett v. Spear*, 520 U.S. 154, 170–71 (1997) (explaining that a plaintiff's burden to establish traceability is "relatively modest" at the pleading stage). Because each appellant pleaded cognizable property injuries that are traceable to the conduct of the Parish and redressable by the various forms of relief they seek from the court, the Organizations have sufficiently demonstrated standing for those alleged property injuries. *See Spokeo,* 578 U.S. at 338.

### D. *Stigmatic-Injury Standing*

The Organizations also argue that the district court erred in holding that they do not have standing based on stigmatic injury. We agree.

Stigmatic injury "accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct[.]" *Moore v. Bryant*, 853 F.3d 245, 249 (5th Cir. 2017) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)) (rejecting a claim that the inclusion of the Confederate battle flag on the Mississippi state flag conferred standing under the Equal Protection Clause). "Classifications based on race carry a danger of stigmatic harm . . . [and] may in fact promote notions of racial inferiority and lead to a politics of racial hostility." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989)). But racial classification alone does not amount to a showing of individualized harm. *Moore,* 853 F.3d at 249 (citing *Carroll v. Nakatani*, 342 F.3d 934, 946 (9th Cir. 2003)). To plead standing based on a stigmatic injury, plaintiffs must plead that they were personally subjected not merely to racial classification, but to discriminatory treatment. *Id.* Put another way, "when plaintiff[s] ground their equal protection injuries in stigmatic harm, they only have standing if they also allege discriminatory treatment." *Barber v. Bryant*, 860 F.3d 345, 356 (5th Cir. 2017).

21

No. 23-30908

The district court did not explicitly address whether the Organizations suffered a stigmatic injury. Instead, it briefly concluded that "alleging broadly unequal treatment as a basis for numerous claims does not suffice" to meet the Organizations' burden to establish standing.[12] Upon closer examination, however, the Organizations' allegations suffice to establish stigmatic injury.

To start, the Organizations alleged racial classification in the Parish's land use decisions. Moreover, the Organizations pleaded that those decisions have personally subjected them to unequal treatment because the Parish consistently steers hazardous industrial development toward the predominantly Black districts (where they reside and worship) while shielding predominantly White districts from industrial development.

Indeed, the Organizations' Amended Complaint is replete with allegations of such unequal treatment. *Supra* III.A. In a letter to the St. James Parish Council, LeBoeuf, founding member of Inclusive Louisiana, and Lavigne, founding member of RISE, said that "[i]t is painful to see a land use map that so clearly signals the disregard of *our* lives and communities . . . clearing the way for more industry, more pollution, and more harm." On a separate occasion, Lavigne pleaded with the council once more stating that "it seems like you all like to push everything in the 5th District. Why? Because of the minorities and because of the [B]lacks. I don't know what it would take for this council to stand with this community and stop granting permits to every company." Similarly, in a council meeting regarding an industrial project to be built within the Fourth and Fifth District, Pastor Joseph lamented, "[w]hy does it always have to be us?" These statements, juxtaposed with the Organizations' statements about how

_____

[12] The district court did not dismiss any claims based on this reasoning.

22

No. 23-30908

consistently the Parish heeds the concerns of its majority-White districts, demonstrate the Organizations' well-pleaded allegations that they were racially classified and denied equal treatment.

In sum, the Organizations have pleaded a stigmatic injury sufficient for Article III adjudication.

\*　　\*　　\*

Of course, whether the Organizations will prove their allegations or prevail on any of their claims remains to be seen. At this juncture, however, we merely acknowledge that they have standing to pursue them.

## IV.

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

April 09, 2025

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

    No. 23-30908    Inclusive Louisiana v. St. James Parish
                    USDC No. 2:23-CV-987

Enclosed is a copy of the court's decision.  The court has entered judgment under Fed. R. App. P. 36.  (However, the opinion may yet contain typographical or printing errors which are subject to correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41 govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require you to attach to your petition for panel rehearing or rehearing en banc an unmarked copy of the court's opinion or order.**  Please read carefully the Internal Operating Procedures (IOP's) following Fed. R. App. P. 40 for a discussion of when a rehearing may be appropriate, the legal standards applied and sanctions which may be imposed if you make a nonmeritorious petition for rehearing en banc.

<u>Direct Criminal Appeals</u>.  Fed. R. App. P. 41 provides that a motion for a stay of mandate under Fed. R. App. P. 41 will not be granted simply upon request.  The petition must set forth good cause for a stay or clearly demonstrate that a substantial question will be presented to the Supreme Court.  Otherwise, this court may deny the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court and/or on appeal, and are considering filing a petition for <u>certiorari</u> in the United States Supreme Court, you do not need to file a motion for stay of mandate under Fed. R. App. P. 41.  The issuance of the mandate does not affect the time, or your right, to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible for filing petition(s) for rehearing(s) (panel and/or en banc) and writ(s) of certiorari to the U.S. Supreme Court, unless relieved of your obligation by court order.  If it is your intention to file a motion to withdraw as counsel, you should notify your client promptly, **and advise them of the time limits for filing for rehearing and certiorari**.  Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

The judgment entered provides that Appellees pay to Appellants the costs on appeal. A bill of cost form is available on the court's website www.ca5.uscourts.gov.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Jasmine J. Forman, Deputy Clerk

Enclosure(s)

Mr. Baher Azmy
Ms. Danielle Lauren Borel
Mr. Carroll Devillier Jr.
Ms. Sadaf Doost
Mr. John Baird King
Mr. Devin Lowell
Ms. Clara Potter
Mr. William P. Quigley
Ms. Astha Sharma Pokharel
Ms. Pamela Carol Spees
Ms. Kate Stith

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 9, 2025

Lyle W. Cayce
Clerk

No. 23-30908

INCLUSIVE LOUISIANA, *by and through their members*; MOUNT TRIUMPH BAPTIST CHURCH, *by and through their members*; RISE ST. JAMES, *by and through their members*,

                              *Plaintiffs—Appellants,*

*versus*

ST. JAMES PARISH; ST. JAMES PARISH COUNCIL; ST. JAMES PARISH PLANNING COMMISSION,

                              *Defendants—Appellees.*

───────────────────────────

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:23-CV-987

───────────────────────────

Before HIGGINBOTHAM, STEWART, and HAYNES, *Circuit Judges*.

## JUDGMENT

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED, and the cause is REMANDED to the

District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that Appellees pay to Appellants the costs on appeal to be taxed by the Clerk of this Court.

The judgment or mandate of this court shall issue 7 days after the time to file a petition for rehearing expires, or 7 days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. See Fed. R. App. P. 41(b). The court may shorten or extend the time by order. See 5th Cir. R. 41 I.O.P.